**J.H. RUTTER REX MFG. COMPANY, INC., Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 87–4699.

United States Court of Appeals, Fifth Circuit.

Sept. 7, 1988.

Edward B. Benjamin, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Robert W. Nuzum, Deutsch, Kerrigan & Stiles, New Orleans, La., for petitioner-appellant.

Michael L. Paup, Chief, David I. Pincus, William A. Whitledge, Asst. Attys. Gen., Gary R. Allen, William Rose, Appellate Section, Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before THORNBERRY, WILLIAMS and SMITH, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

I. *Factual Background and Prior Proceedings*

We grapple with serious procedural and substantive issues involving the corporate accumulated earnings tax. We also consider a valid issue concerning an alleged taxpayer waiver of limitations.

J.H. Rutter Rex Manufacturing Company, Inc. ("Rutter Rex") is a Louisiana corporation, incorporated July 1, 1930. The company manufactures work pants, work shirts, jeans, casual pants, casual shirts,

and other clothing items. Rutter Rex does not have any retail distribution facilities or networks but instead manufactures and supplies clothing items to large retailers like J.C. Penney, Sears, and Montgomery Ward, and to large manufacturers like Levi Strauss. Sales to J.C. Penney, for example, constituted 47.3% of Rutter Rex's total sales in 1976; 45% in 1977; 50% in 1978; and 78% in 1979. The company has also supplied clothing items to the military.[1] James H. Rutter, chairman of the board of Rutter Rex and its chief executive officer, owns 99.908% of the stock of Rutter Rex and his wife Marie owns the remaining 0.092%. Their son, Eugene Rutter, president and chief operations officer of the company, owns no stock in the company. For additional background facts see the companion case, *James H. Rutter and Marie R. Rutter v. Commissioner of Internal Revenue*, 853 F.2d 1267 (5th Cir.1988).

Rutter Rex claims that its business is heavily subject to changes in styles and fads and that it must constantly adapt its manufacturing facilities and retrain its employees to satisfy the fluctuating needs of its customers. The company asserts that the large amounts of accumulated earnings and profits it retains in its coffers[2] are needed to cover, among other things, the expenses necessitated by this fluctuating market, especially in light of James Rutter's aversion to borrowing money.[3]

In March 1979, IRS Agent Joseph Benigno audited Rutter Rex's 1976, 1977, and 1978 income tax returns and proposed adjustments relating to boat expenses, travel deductions, general and administrative expenses, costs of goods sold calculations, maintenance and repair deductions, and depreciation deductions. These adjustments amounted to $26,915 for the three years. In his report Benigno considered and discussed the deductions Rutter Rex had taken for compensation it paid to James and Eugene Rutter and the company's accumulation of earnings,[4] but he did not propose any adjustments against Rutter Rex with respect to these two issues. In December 1979, Eugene Rutter, acting as president and chief operations officer of Rutter Rex, signed a Form 872 "Consent to Extend the Time to Assess Tax" on behalf of Rutter Rex, extending until December 31, 1980, the period for assessing the amount of any federal income tax due for taxable year 1976. Rutter Rex paid the income tax deficiencies attributable to Agent Benigno's adjustments on February 15, 1980.

Beginning on October 7, 1980, IRS Agent Richard McConnell tried to get an officer of Rutter Rex to sign another Form 872 to extend the period for assessing the amount of Rutter Rex's federal income taxes due for taxable years 1976 and 1977 to December 31, 1981. McConnell had been assigned the Rutter Rex audit to reevaluate the rea-

---

1. Rutter Rex's sales to the military constituted 24.6% of its total sales in 1976; 41.2% in 1977; 35.0% in 1978; less than 1.0% in 1978; and 0% in 1979. The decrease in sales to the military in 1978 and 1979 apparently was largely attributable to the government's practice of setting aside certain clothing manufacturing contracts to "small businesses" for which Rutter Rex did not qualify. Rutter Rex brought suit against the government challenging these practices in 1977 and 1978. These suits were largely unsuccessful, but Rutter Rex did obtain some additional government business by the mid–1980's.

2. Rutter Rex's net liquid assets (current assets minus current liabilities with inventories valued at FIFO) amounted to $7,329,170 as of December 31, 1977, and $8,151,306 as of December 31, 1978. The company's accumulated earnings and profits with its inventories valued at FIFO totaled $6,500,068 as of December 31, 1976, and $7,419,183 as of December 31, 1977.

3. James Rutter evidently was taught from an early age by his father not to borrow money. James Rutter testified that throughout its history Rutter Rex borrowed money only as a last resort. The company did not have any bank loans outstanding from December 31, 1971, to December 31, 1981.

4. 26 I.R.C. §§ 531–537, impose an accumulated earnings tax on that portion of the earnings of a corporation that has been accumulated in excess of the corporation's "reasonable business needs" for the purpose of avoiding the taxation of those amounts as dividends in the hands of the corporation's shareholders. The purpose of this penalty tax is to compel the company to distribute any profits not needed for the conduct of its business so that when such funds are distributed, individual stockholders will be liable for taxes on the dividends received. *Ivan Allen Company v. United States,* 422 U.S. 617, 95 S.Ct. 2501, 45 L.Ed.2d 435 (1975).

sonable compensation and accumulated earnings issues. On October 10, 1980, Eugene Rutter told McConnell that any further conversations regarding Rutter Rex's tax liability should be made through its attorney, Mr. Edward B. Benjamin, Jr. On October 15, 1980, McConnell was sent a copy of a power of attorney (IRS Form 2848) exercised in Benjamin's favor by Eugene Rutter on behalf of Rutter Rex for tax year 1976–1978.

On November 25, 1980, Agent McConnell attended a meeting at Rutter Rex's offices in New Orleans to discuss his proposed adjustments regarding accumulated earnings and reasonable compensation. McConnell, however, had not yet determined the dollar amounts of these adjustments. James Rutter, Eugene Rutter, Mr. Benjamin, Rutter Rex's tax C.P.A. (Michael J. O'Rourke), Rutter Rex's audit C.P.A. (William Hogan), and Rutter Rex's controller (Jake Haney) were all in attendance. McConnell once again asked James or Eugene to sign a Form 872 for tax years 1976 and 1977, but Mr. Benjamin advised them not to sign until they knew the actual dollar amounts of the proposed adjustments.

After the meeting had concluded and after Benjamin and O'Rourke had left, McConnell finally persuaded Eugene Rutter in the presence of the others to execute the Form 872 consent by allegedly promising to bring the form to the next meeting scheduled on December 3, 1980, at Rutter Rex's offices and not to release the consent form to his supervisor until then. McConnell, however, left Rutter Rex's offices immediately and gave the Form 872 to his supervisor who signed the consent form that same day. After noting how quickly McConnell had left, Eugene Rutter called

Mr. Benjamin and told him that he had signed the consent form. Evidently Mr. Benjamin was quite upset with Eugene for signing the form.

As specified in 26 I.R.C. § 534(b), the IRS notified Rutter Rex on May 21, 1981, that it proposed to issue a notice of deficiency to assert that the company was liable for the accumulated earnings tax for 1976–1979. Rutter Rex timely submitted a statement in response as provided by § 534(c), listing seven grounds justifying its accumulations of earnings and profits during the years at issue. On December 17, 1981, the Commissioner issued a notice of deficiency determining an accumulated earnings tax of $446,658 for 1977 and $598,077 for 1978.[5] In this notice, the Commissioner specified that Rutter Rex had retained current earnings and profits of $1,188,723 in 1977 and $1,582,018 in 1978 and that these entire amounts were subject to the accumulated earnings tax. The Commissioner did not assess an accumulated earnings tax on Rutter Rex for tax years 1976 or 1979. The notice of deficiency also notified Rutter Rex that the Commissioner was disallowing a substantial portion of the deductions the company had taken under 26 I.R.C. § 162(a)(1) for compensation paid to James and Eugene Rutter, resulting in additional income taxes for Rutter Rex ($367,621 for 1976; $199,800 for 1977; and $199,800 for 1978). On March 22, 1982, Rutter Rex filed a petition in the Tax Court disputing these proposed deficiencies.

On August 22, 1983, Rutter Rex filed a pretrial motion pursuant to Rule 142(e) of the Tax Court Rules of Practice and Procedure for a ruling on the burden of proof with respect to issue of accumulation of earnings.[6] A hearing was held on the accu-

---

**5.** 26 I.R.C. § 531 provides:

§ 531. Imposition of accumulated earnings tax

In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of—

(1) 27½ percent of the accumulated taxable income not in excess of $100,000, plus

(2) 38½ percent of the accumulated taxable income in excess of $100,000.

**6.** 26 I.R.C. § 534 allows the taxpayer to shift the burden of proof to the Commissioner on the accumulated earnings tax issue with respect to those grounds in the taxpayer's § 534(c) statement which the taxpayer claims justify all or part of the accumulation and which are sufficiently supported by factual allegations.

mulated earnings burden of proof issue on October 5, 1983. On December 12, 1983, the Tax Court issued an order and opinion denying Rutter Rex's motion to shift the burden of proof to the Commissioner with respect to five of the seven grounds asserted in the § 534 statement. The court held that the statement failed to provide sufficient facts to show the basis of these five grounds for accumulating earnings. 81 T.C. 937 (1983).

Rutter Rex filed an immediate appeal of this burden of proof order to this Court. The Commissioner filed a motion to dismiss the appeal for lack of jurisdiction based on the ground that the Tax Court order was not a final decision. We granted the motion to dismiss. Rutter Rex petitioned the United States Supreme Court for writ of certiorari, which that court denied. 469 U.S. 980, 105 S.Ct. 381, 83 L.Ed.2d 316 (1984).

Trial before the Tax Court on the issues of accumulated earnings, the validity of the Form 872, and reasonable compensation took place June 17–21, 1985. After trial, the Tax Court concluded that Rutter Rex was indeed subject to the accumulated earnings tax for the tax years 1977 and 1978 and that the deficiencies attributable to the accumulated earnings tax were $433,953 for 1977 and $545,524 for 1978. The Tax Court also disallowed a substantial portion of the deductions under § 162(a)(1) Rutter Rex had claimed for compensation paid to James and Eugene Rutter, which resulted in income tax deficiencies for Rutter Rex of $229,217 for 1976, $183,960 for 1977, and $134,280 for 1978.

The Tax Court's Memorandum Findings of Fact and Opinion was filed August 28, 1986. 52 T.C.M. (CCH) 326 (1986). Pursuant to a motion for reconsideration and revision of findings of fact and request for further trial the Tax Court, on November 24, 1986, issued an Order and Memoran-

dum Sur Order which revised the earlier opinion. The 1979 reasonable compensation figures had been inadvertently left out of the earlier opinion, and the other revisions were necessary because of an error made by the Tax Court in calculating Rutter Rex's expenses. The court denied appellants' motion in all other respects. Appellants filed another motion for reconsideration which was denied by the Tax Court. On June 22, 1987, the Tax Court decision was entered, assessing federal income tax deficiencies against Rutter Rex of $229,217 for 1976, $617,913 for 1977, and $679,804 for 1978. Rutter Rex appeals.

## II. *Reasonable Compensation Deductions*

In the companion case, *James H. Rutter and Marie R. Rutter v. Commissioner,* 853 F.2d 1267 (5th Cir.1988), we affirmed the Tax Court's determination of reasonable compensation for James and Eugene Rutter for 1976–1979 and the deficiencies the court assessed against James and Marie Rutter. Correlatively we affirm the Tax Court's assessment against the corporation, Rutter Rex, of income tax deficiencies resulting from the court's disallowance of deductions under § 162(a)(1) by Rutter Rex for the excessive amounts of compensation the company paid to James and Eugene Rutter during 1976–1979.

## III. *The Form 872 Consent*

26 I.R.C. § 6501(a) provides a general three year statute of limitations for the assessment of income taxes, with the period commencing on the date on which the tax return was filed. 26 I.R.C. § 6501(c)(4), however, provides that the three-year assessment period may be extended by agreements in writing.[7] In this case, taxpayer's president and chief operations officer, Eugene Rutter, signed an extension agreement on November 25, 1980, (the Form 872) which, if valid, extended the

---

7. 26 I.R.C. § 6501(c)(4) reads:

(c) Exceptions.—

. . . . .

(4) Extension by agreement.—Where, before the expiration of the time prescribed in this section for the assessment of any tax imposed by this title, ... both the Secretary and the

taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.

limitations period for tax years 1976 and 1977 to December 31, 1981.[8] The Commissioner issued the notice of deficiency at issue in this case on December 17, 1981. Thus, only if the November 25, 1980, Form 872 is valid are the deficiencies asserted by the Commissioner for 1976 and 1977 against taxpayer not barred by the statute of limitations.

■ As a general rule, when a taxpayer shows that the assessment of a tax is barred by the general statute of limitations, the Commissioner bears the burden of showing that the case falls within the exception relied upon. *Armes v. Commissioner,* 448 F.2d 972, 974 (5th Cir.1971). This burden is met when the Commissioner introduces into evidence a consent agreement, valid on its face, that extends the period of limitations for assessment up to the date of mailing of the notice of deficiency. *Lefebvre v. Commissioner,* 47 T.C.M. (CCH) 1572, 1574 (1984); *Rault v. Commissioner,* 43 T.C.M. (CCH) 1446, 1450 (1982); *Concrete Engineering Company v. Commissioner,* 58 F.2d 566, 568 (8th Cir.1932).

■ After the Commissioner introduces a consent agreement which is valid on its face, but the taxpayer asserts that the consent is ineffective, the taxpayer bears the burden of proving the invalidity of the consent. *See Lefebvre,* 47 T.C.M. at 1574; *Rault,* 43 T.C.M. at 1450; *Crown Willamette Paper Company v. McLaughlin,* 81 F.2d 365, 367 (9th Cir.1936); *Concrete Engineering,* 58 F.2d at 568. Here there is no question that an extension agreement for tax years 1976 and 1977 was executed on November 25, 1980, by Eugene Rutter and received and executed by a representative of the IRS that same day. The Commissioner correctly asserts that the consent was thus valid on its face and therefore the burden fell on Rutter Rex to prove its invalidity at trial. The Commissioner claims the Tax Court correctly held that Rutter Rex failed to carry that burden.

■ Rutter Rex submits that the Form 872 was invalid because (1) the form was not dated by Eugene Rutter and was unilaterally altered by an IRS employee by that employee's dating the document; (2) the form was obtained by duress and fraud; (3) the form was obtained by deception and undue influence; and (4) the form was obtained without notifying appellant's duly authorized representative, attorney Benjamin, who was authorized by power of attorney to receive confidential information and to execute consent forms extending the statutory periods for the assessment and collection of tax. Appellant asserts the Tax Court's upholding of the validity of the Form 872 was clearly erroneous.

In support of its contention, Rutter Rex argues that the Tax Court improperly distinguished its prior holdings in several cases from the facts of the present case. It asserts that in those cases, the Tax Court held that consent forms were rendered invalid by the absence of a date, *Mantzel v. Commissioner,* 41 T.C.M. (CCH) 1237 (1981), by an IRS employee's unilateral alteration of the consent form without the taxpayer's consent, *Cary v. Commissioner,* 48 T.C. 754 (1967), by an IRS employee's harassment and duress, *Robertson v. Commissioner,* 32 T.C.M. (CCH) 955 (1973), and by an IRS employee's fraud, *Neuhoff v. Commissioner,* 75 T.C. 36 (1980), *aff'd* 669 F.2d 291 (5th Cir. 1982).

These cases upon which Rutter Rex relies, however, do not control. In *Mantzel* the lack of a date indicating when the taxpayer signed the consent form and other circumstances made it impossible for the court to determine whether the form had been executed prior to the expiration of the limitations period. The Tax Court concluded that the Commissioner had failed to prove that the consent was executed prior to the running of the statute of limitations and thus the consent was ineffective in extending the period for assessment. In the case at bar, taxpayer concedes that Eugene Rutter executed the consent form

---

**8.** The three-year limitations period for 1977 was to expire on March 15, 1981. The limitations period for 1976 had previously been extended to

December 31, 1980, by the earlier Form 872 signed by Eugene Rutter.

and that the IRS received and approved the form prior to the expiration of the limitations period.

In *Cary,* the unilateral alteration of the consent form by the IRS employee consisted of the correction of an error in the form regarding the taxable year for which the extension was sought after the taxpayer had signed the form. The Tax Court held that the consent form was not valid because this material alteration was made without consultation with the taxpayer or his representative. The alleged subsequent dating of the Form 872 by Agent McConnell in the case at bar is not intrinsically prejudicial and does not constitute a material alteration warranting the invalidation of the form.

The record does not support Rutter Rex's claim that Eugene Rutter's signature was obtained by duress, undue influence, deception, or fraud. In *Robertson,* the revenue agent offered an uncounseled taxpayer a choice between signing the consent form or subjecting his property to seizure. The Tax Court found duress under those circumstances. Rutter Rex's allegations of improper acts by Agent McConnell fall far short of establishing duress or undue influence. *See United States v. Martin,* 274 F.Supp. 1002, 1005–06 (E.D.Mo.1967), *aff'd* 411 F.2d 1164 (8th Cir.1969); *Willhoit v. Commissioner,* 308 F.2d 259, 262–3 (9th Cir.1962); *Lusk v. Commissioner,* 250 F.2d 591, 595 (7th Cir.1957), *cert. denied,* 357 U.S. 932, 78 S.Ct. 1376, 2 L.Ed.2d 1375 (1958).

Taxpayer's claims of fraud and deception are also unconvincing. Eugene Rutter was a seasoned business executive who knew the legal significance of his signing the consent form and handing it over to Agent McConnell. He had previously signed a number of these forms on behalf of Rutter Rex. He was well counseled by Mr. Benjamin. Eugene also conferred with his father, Rutter Rex's audit C.P.A., and Rutter Rex's controller prior to signing the form. His assertion that he did not date the Form 872 because he thought the form would be ineffective without a date is not supported by the record. Eugene's later claim at trial that he signed the form only after Agent McConnell told him that he would not turn the form over to his IRS supervisor for processing until after the next scheduled meeting on December 3, 1980, is contradicted by Eugene's own notes he made shortly after signing the Form 872 at the November 25, 1980, meeting. In those notes, Eugene indicated that he knew that McConnell was planning to process the form immediately in order to appease his IRS supervisor who was pressuring him on the Rutter Rex case.

Finally, Agent McConnell's obtaining Eugene's signature on the Form 872 without prior notice being sent to taxpayer's duly authorized representative, attorney Benjamin, although not commendable behavior, is not a ground for invalidating the consent form. Agent McConnell was under no obligation to request an extension only from Mr. Benjamin, although this is the usual IRS procedure. *See Neuhoff v. Commissioner.* Eugene Rutter, as president and chief operations officer of Rutter Rex, had the authority to sign the Form 872 on behalf of the company. This authority does not appear to have been extinguished by the execution of the power of attorney in Mr. Benjamin's favor giving Benjamin this authority also. *See Narragansett Wire Co. v. Commissioner,* 491 F.2d 371, 373 (1st Cir.1974). Indeed, Mr. Benjamin advised Eugene and his father not to sign the form at the November 25, 1980, meeting, a clear concession that he did not have sole authority. Eugene Rutter was aware of the legal significance of his signing the Form 872, and we cannot characterize Agent McConnell's behavior as taking advantage of an unsuspecting taxpayer. *See Neuhoff v. Commissioner.*

In summary, the Tax Court's upholding the validity of the Form 872 consent was not clearly erroneous. The Tax Court did not err in holding that the consent was valid on its face and that Rutter Rex did not carry its burden of proving the consent was invalid.

IV. *The § 534 Statement and Burden of Proof*

Rutter Rex claims the Tax Court erred in not shifting the burden of proof to the

Commissioner as to the first five grounds contained in its § 534 statement for accumulating its earnings and profits during 1977 and 1978.[9] The five grounds in dispute are Rutter Rex's asserted needs for funds to cover: (1) working capital for the normal operations of its business; (2) replacement of and improvements to fixed assets; (3) development, production, and distribution of product; (4) disruptions in business resulting from labor disputes; and (5) new supply contracts with the military. Rutter Rex claims the Tax Court applied an incorrect legal standard in determining the burden of proof issue contrary to our holding in *Motor Fuel Carriers, Inc. v. Commissioner*, 559 F.2d 1348 (5th Cir. 1977). Our independent review of Rutter Rex's § 534 statement, and our reading of *Motor Fuel Carriers*, however, convinces us that the Tax Court did not err in refusing to shift the burden of proof to the Commissioner as to the first five grounds in the § 534 statement.

■ The burden of proof can be shifted to the Commissioner only as to those grounds in the taxpayer's § 534 statement which are supported by sufficiently detailed facts, which, if proved, would tend to establish that the earnings and profits were not accumulated beyond the reasonable business needs of the company. *Petrozello Company v. Commissioner*, 46 T.C.M. (CCH) 63, 68 (1983); *Powder Mill Realty Trust v. Commissioner*, 32 T.C.M. (CCH) 707, 715 (1973); *American Metal Products Corp. v. Commissioner*, 34 T.C. 89, 99–100 (1960), *aff'd*, 287 F.2d 860 (8th Cir.1961); *I.A. Dress Co., Inc. v. Commissioner*, 32 T.C. 93, 100 (1959), *aff'd* 273

F.2d 543 (2nd Cir.1960). The facts must be substantial, material, definite, and clear. *Thompson Engineering Company v. Commissioner*, 80 T.C. 672, 693 (1983), *rev'd on another point*, 751 F.2d 191 (6th Cir.1985); *Bohac Agency, Inc. v. Commissioner*, 30 T.C.M. (CCH) 979, 982 (1971); *J. Gordon Turnbull, Inc. v. Commissioner*, 41 T.C. 358, 370 (1963), *aff'd*, 373 F.2d 87 (5th Cir.), *cert. denied*, 389 U.S. 842, 88 S.Ct. 72, 19 L.Ed.2d 105 (1967).

Our *Motor Fuel Carriers* decision did not change these requirements for a § 534 statement. Contrary to Rutter Rex's contention, we did not hold in *Motor Fuel Carriers* that § 534 is satisfied if the taxpayer merely gives notice in general terms to the Commissioner of the grounds asserted to justify the accumulation of earnings. To satisfy its "notice function," the § 534 statement must contain sufficiently detailed factual allegations supporting the grounds. Obviously the statute does not contemplate shifting the burden of proof when a taxpayer merely tells the Commissioner it is going to challenge the imposition of the accumulated earnings tax. There must be notice of the specific grounds and contentions.

Thus, in *Motor Fuel Carriers*, we held only that the Tax Court had failed to distinguish between the substantive § 533(a) inquiry at trial as to whether the taxpayer actually established its needs for accumulating earnings and the procedural § 534 inquiry as to whether its statement sufficed "to show the basis" of these needs prior to trial in order to give the Commissioner "a sufficiently specific idea of how

---

9. The relevant part of 26 I.R.C. § 534 provides:
 § 534. Burden of proof
 (a) General rule.—In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall—

 . . . . .

 (2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection.

 (c) Statement by taxpayer.—Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business.

[taxpayer] planned to proceed at trial." 559 F.2d at 1352. The Tax Court in the case at bar was aware of this important distinction and said it "carefully considered the petitioner's section 534(c) statement in light of" our *Motor Fuel Carriers* decision. Moreover, in *Motor Fuel Carriers* we independently examined the § 534 statement, described it as "lengthy," and concluded that it gave the government a sufficiently clear idea of how the taxpayer planned to proceed at trial.

■ We cannot say the same about Rutter Rex's § 534 statement. This statement consisted of only eight pages briefly describing in broad and general terms the seven grounds which Rutter Rex claimed justified its accumulations. Nowhere in the § 534 statement does Rutter Rex ever quantify the purported needs of the company in dollar amounts for any of the grounds asserted for any given year. Virtually no financial information supporting Rutter Rex's needs for working capital, the first of the five disputed grounds, was presented.[10] Nor were there any support-

ing facts showing that in 1977 and 1978 Rutter Rex had specific, definite, and feasible plans or needs for accumulating its earnings in regard to the other four disputed grounds.[11] The § 534 statement in the *Motor Fuel Carriers* case contained such information. *See also Proctor v. Commissioner*, 42 T.C.M. (CCH) 725, 735 n. 6 (1981). We see no error in the Tax Court's holding that Rutter Rex's § 534 statement did not contain "facts sufficient to show the basis" of the first five grounds asserted in the statement. *Herzog Miniature Lamp Works, Inc. v. Commissioner*, 481 F.2d 857, 862 (2nd Cir.1973).

## V. *Imposition of the Accumulated Earnings Tax*

■ The accumulated earnings tax applies to corporations "formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed." 26 I.R.C. § 532(a).[12] A corporation is

**10.** The need for working capital can constitute a legitimate ground for accumulating earnings. The Tax Court noted the absence of data in Rutter Rex's § 534 statement regarding the company's net liquid assets, inventory on hand, average inventory, net sales for the year, accounts receivable, and operating cycles. Without such data, at least in a preliminary format, the Commissioner is at a loss concerning taxpayer's needs for working capital. *See Shaw-Walker Company v. Commissioner*, 390 F.2d 205, 211, 217–33 (6th Cir.1968), *judgment vacated by* 393 U.S. 478, 89 S.Ct. 707, 21 L.Ed.2d 687 (1969), *on remand*, 412 F.2d 858 (6th Cir.1969).

**11.** The regulations under § 537 provide that the reasonable needs of a business include reasonably anticipated future needs of the business. In order to justify an accumulation of earnings and profits for reasonably anticipated future needs, however, "the corporation must have specific, definite, and feasible plans for the use of such accumulation." Treas.Reg. § 1.537–1(b)(1). The Tax Court noted that as to ground two (replacement and improvements to fixed assets), Rutter Rex's statement contained no facts concerning which assets were to be replaced or improved in 1977 or 1978, no facts indicating any specific plans in 1977 or 1978 for the replacement or improvement of assets, and no facts reflecting any decisions in 1977 and 1978 to set aside specific amounts of accumulated earnings for replacement or improvement of assets. As to ground three (development, pro-

duction, and distribution of product), the Tax Court noted the statement contained no facts showing any need for the accumulation of earnings and profits in 1977 or 1978 for this purpose. As to ground four (potential labor troubles), the Tax Court said the statement failed to set forth sufficient facts to show the likelihood of labor problems in 1977 and 1978, or to quantify the cost of hiring new workers or the amount of anticipated losses from labor problems. As to ground five (supply contracts with the military), the Tax Court said the statement failed to set out sufficient supporting facts reflecting realistic plans or hopes in 1977 and 1978 of actually securing additional business from the military.

**12.** We note that Rutter Rex has made only three dividend payments during its entire existence, the last one being a $400,000 dividend paid to James Rutter in 1972. The company, however, has been quite generous in its compensation to James and Eugene Rutter. So generous in fact that portions of the compensation paid to James Rutter have been recharacterized as dividend payments. But the payment of large salaries and dividends to shareholder/employees does not overcome an otherwise objectionable accumulation, *Henry Van Hummell, Inc. v. Commissioner*, 364 F.2d 746, 751 (10th Cir.1966), *cert. denied*, 386 U.S. 956, 87 S.Ct. 1019, 18 L.Ed.2d 102 (1967), although it might have some bearing on the tax avoidance/intent issue.

not subject to the accumulated earnings tax if its accumulations are required for the "reasonable needs of the business." 26 I.R.C. § 535(c)(1). Thus, there are two elements to the imposition of the tax: (1) intent to avoid shareholder taxes, and (2) accumulation of earnings and profits beyond the corporation's reasonable business needs. *Central Motor Company v. United States,* 583 F.2d 470, 476 (10th Cir.1978). The parties' primary focus in this case is on the second issue, the question of whether there were unreasonable accumulations by Rutter Rex.[13] The Tax Court found that Rutter Rex had accumulated its earnings and profits beyond its reasonable business needs. Our review of the record, however, convinces us that a remand is necessary in order for the Tax Court to reevaluate some of these needs with greater accuracy and in greater detail.

The accumulated earnings tax is levied only on the undistributed *current* earnings and profits unreasonably accumulated in the taxable year and does not extend to any previously accumulated earnings and profits from prior years. The corporation's previously accumulated earnings and profits, however, are significant. If these amounts are themselves sufficient to satisfy the corporation's reasonable needs for the year, then none of the current year's earnings and profits can be considered as having been retained for the reasonable needs of the business. Treas.Reg. § 1.535–3(b)(1)(ii). Therefore, determinations of the corporation's reasonable business needs for the years at issue and determinations of the levels of its previous accumulated earnings and profits both must be made.

Under the tax laws a corporation properly can finance its various financial needs from its retained earnings. The laws do not force it to turn to available commercial financing. The decision not to rely on credit is up to the business judgment of corporate management. The IRS and the courts have no power to substitute their judgment for the valid business judgment of corporate management to operate without extensive borrowing. *See Shaw-Walker Co.,* 390 F.2d at 213 ("The fact that a taxpayer has financed its growth from retained earnings rather than from the sale of additional stock or commercial borrowing 'should not place it in a position of being subjected to a penalty tax under Section 531.'" (citation omitted)); *John P. Scripps Newspapers v. Commissioner,* 44 T.C. 453, 468 (1965). This is true even though the corporation may have the ability to obtain favorable outside credit. *See Myron's Enterprises v. United States,* 548 F.2d 331, 335 n. 6 (9th Cir.1977).

Whether a taxpayer's accumulation of earnings and profits is in excess of the reasonable needs of its business is a question of fact. *Central Motor Co.,* 583 F.2d at 476; *Shaw-Walker Co.,* 390 F.2d at 210. A trial court's determination of the reasonable business needs of a corporation is thus reviewable by this Court under the clearly erroneous standard. *Myron's Enterprises,* 548 F.2d at 334. In ascertaining the reasonableness of accumulations of earnings, however, each corporation's business must be assessed in light of its own particular requirements. *Central Motor Co.,* 583 F.2d at 476; *Cheyenne Newspapers, Inc. v. Commissioner,* 494 F.2d 429, 432 (10th Cir.1974). Determination of a corporation's reasonable business needs is properly left to the corporation's management since they are most familiar with the complexities and makeup of their corporation and its business. *Thompson Engineering Co.,* 751 F.2d at 197; *Central Mo-*

---

13. 26 I.R.C. § 533(a) creates a presumption of a tax avoidance motive if the corporation's accumulations are unreasonable which is determinative "unless the corporation by the preponderance of the evidence shall prove to the contrary." The Supreme Court has noted that the congressional intent has been for the courts to focus on the accumulation issue since "[t]he reasonableness of an accumulation, while subject to honest difference of opinion, is a much more objective inquiry, and is susceptible of more effective scrutiny, than are the vagaries of corporate motive." *United States v. Donruss Company,* 393 U.S. 297, 307, 89 S.Ct. 501, 507, 21 L.Ed.2d 495 (1969). Furthermore, the intent issue really does not come into play unless there is an unreasonable accumulation, since a corporation is allowed an "accumulated earnings credit" in an amount equal to the reasonable needs of the business. 26 I.R.C. § 535(c)(1).

*tor Co.*, 583 F.2d at 476; *Henry Van Hummell*, 364 F.2d at 749; *John P. Scripps Newspapers*, 44 T.C. at 468.

The courts must be reluctant to substitute their judgment for that of corporate management as to reasonable business needs unless relevant facts and circumstances show unjustifiable decisions by management. *Alma Piston Company v. Commissioner*, 35 T.C.M. (CCH) 464, 474 (1976), *aff'd* 579 F.2d 1000 (6th Cir.1978); *Bremerton Sun Publishing Company v. Commissioner*, 44 T.C. 566, 583 (1965). Such facts and circumstances could include, for example, a corporation's failure to pay dividends for a period of years despite an ever increasing stockpile of accumulated earnings. Of course, as we explained earlier, in making the evaluation of the proper level of acceptable accumulation, the burden of justification was properly placed by the Tax Court on Rutter Rex. The corporation had to establish that it did not accumulate earnings beyond its reasonable business needs. Nevertheless, since the accumulated earnings tax is a penalty tax paid in addition to the regular tax on corporate earnings, it is to be strictly construed. *Ivan Allen Co.*, 422 U.S. at 626, 95 S.Ct. at 2506.

Several Treasury Regulations have been promulgated under 26 I.R.C. § 537 to provide a framework for evaluating the reasonable needs of a business. Treas. Reg. § 1.537–(1)(a) in part provides: "An accumulation of the earnings and profits (including the undistributed earnings and profits of prior years) is in excess of the reasonable needs of the business if it exceeds the amount that a prudent businessman would consider appropriate for the present business purposes and for the reasonably anticipated future needs of the business." A corporation's need for working capital constitutes a recognized present business need for accumulating earnings. Treas. Reg. § 1.537–2(b)(4).[14] Reasonably anticipated future needs of a business are those beyond the day-to-day working capital needs of a business and include the need for funds for the expansion of a business or replacement of plants, and the need for funds to provide for certain adverse business contingencies. Treas. Reg. § 1.537–2.[15] The case law interpreting these statutes and regulations fleshes out these concepts, and it is to these cases that we now turn our attention.[16]

### A. Calculation of Rutter Rex's Operating Cycle

█ In analyzing the working capital needs of corporations, the courts usually have calculated the corporation's working capital needs for a single, complete "operating cycle." An operating cycle for a manufacturing business like Rutter Rex is the period of time needed to convert cash into raw materials, raw materials into inventory, inventory into accounts receivable, and accounts receivable into cash. In other words, an operating cycle is the time a corporation's working capital is tied up in producing and selling its product. The operating cycle calculation is part of the so-

---

**14.** Working capital essentially is the money a corporation needs to survive on a day-to-day basis and would include money to buy raw materials, to pay for labor costs, and to cover overhead costs. The need for working capital for normal operations was Rutter Rex's first ground justifying its accumulation of earnings in its § 534 statement.

**15.** Grounds 2–5 in Rutter Rex's § 534 statement dealt with reasonably anticipated future needs.

**16.** Before immersing ourselves in this task, we note that the Treasury Regulations also enumerate several uses of corporate funds which may indicate that a corporation's accumulations are unreasonable. These include loans to shareholders, or the expenditure of funds of the corporation for the personal benefit of the shareholders; loans having no reasonable relation to the conduct of the business made to relatives or friends of shareholders, or to other persons; and investment in properties, or securities which are unrelated to the activities of the business of the taxpayer corporation. Treas.Reg. § 1.537–2(c). Rutter Rex denied the existence of any of these factors in grounds 6 and 7 of its § 534 statement, and the Tax Court shifted the burden of proof to the Commissioner as to these factors. The Commissioner did not seriously contend otherwise during the trial. The absence of these factors actually does not establish legitimate grounds for accumulating earnings and profits. Their absence, however, does tend to undercut the tax avoidance presumption of § 533(a). *See* Treas.Reg. § 1.533–1(a)(2).

called "*Bardahl* formula" which is named after the case that originated this approach. *Bardahl Manufacturing Corp. v. Commissioner*, 24 T.C.M. (CCH) 1030 (1965). *See also Apollo Industries, Inc. v. Commissioner*, 358 F.2d 867 (1st Cir.1966).

The courts have applied the *Bardahl* formula in various ways to reflect more accurately the realities of the business operation of each particular taxpayer involved. Although the *Bardahl* formula is a "well-established tool" that is "routinely applied" by the courts, it is not a precise rule of law but instead merely a rule of thumb, "rising only to the level of administrative convenience." *Suwannee Lumber Manufacturing Company, Inc. v. Commissioner*, 39 T.C.M. (CCH) 572, 591 (1979). *See also Thompson Engineering Co.*, 80 T.C. at 697 ("[T]he *Bardahl* formula is an attempt to inject a degree of objectivity into a quantification of business needs; it is a tool to be used when helpful and its use is not mandated in all events."). Both parties in the case at bar now agree generally that the use of the *Bardahl* formula in calculating Rutter Rex's working capital needs was proper.[17] They disagree, however, as to how the formula should be applied in this case.

The "operating cycle" as originally formulated in *Bardahl Manufacturing* is broken down into two sub-cycles: an inventory cycle and an accounts receivable cycle. These cycles are measured in terms of days. An inventory cycle is the time necessary to convert raw materials into finished goods and to sell those goods.[18] An accounts receivable cycle is the time necessary to convert the accounts receivable created by the sale of finished goods into cash.[19] These two cycles are added together to determine the total number of days in the operating cycle. The number of days in the operating cycle is then divided by 365; the resulting fraction is multiplied by the amount of the corporation's operating expenses for one year, including costs of goods sold, selling expenses, general and administrative expenses, and estimated federal and state income tax payments (but excluding depreciation).[20] The resulting

---

**17.** Before the Tax Court, Rutter Rex apparently argued that the *Bardahl* formula should not be applied at all in this case due to the company's unpredictable and speculative business cycle. Rutter Rex does not appear to challenge the use of the *Bardahl* formula in its appeal to this Court. The operating cycle approach of *Bardahl*, however, has been rejected in some cases because the corporation did not have a routine operating cycle. *See e.g., Thompson Engineering Co., supra; EMI Corporation v. Commissioner*, 50 T.C.M. (CCH) 569 (1985).

**18.** The length of the inventory cycle for a given year can be determined by dividing the number of days in one year by the number of times inventory turns over during the year. Inventory turnover can be determined by dividing the costs of goods sold for the year by either average monthly inventory or peak month inventory.

It should be noted that Rutter Rex accounted for its inventories on a LIFO basis for purposes of its tax returns and on its financial statements. Both parties, however, agreed that Rutter Rex's LIFO inventory should be converted to FIFO inventory for purposes of calculating the inventory cycle because the FIFO method of inventory valuation provides a more accurate inventory valuation for purposes of determining corporate liquidity than the LIFO method.

**19.** The length of the accounts receivable cycle can be determined by dividing the number of

days in one year by the number of times accounts receivable turn over during the year. The turnover rate of accounts receivable can be determined by dividing sales for the year by either average monthly accounts receivable or peak month accounts receivable.

**20.** Apparently both parties utilized the actual operating expenses for 1977 and 1978 and the actual operating cycle data (inventory, accounts receivable, accounts payable, accrual, cost of goods sold, sales, and tax figures) for 1977 and 1978 to determine the reasonable amounts of working capital Rutter Rex could accumulate during each year. Some cases, however, have recognized that the earnings a corporation accumulates during a given year are to provide working capital for the *following* year. These cases therefore use the actual or projected operating expenses and the actual or projected operating cycle data for the subsequent year to determine if the accumulation is reasonable for the year at issue. *See e.g. Bardahl International Corp. v. Commissioner*, 25 T.C.M. (CCH) 935 (1966); *Empire Steel Castings, Inc. v. Commissioner*, 33 T.C.M. (CCH) 155 (1974).

Use of the actual or projected figures for the subsequent year allows a corporation to have a working capital cushion for inflation and expansion. Use of the subsequent year's figures during a time of business contraction, however, would lead to a lower amount of reasonable

figure is the amount of liquid assets necessary to meet the ordinary operating expenses for a complete operating cycle.

At trial, the Commissioner's accumulated earnings tax expert, Mr. Gomprecht, modified Rutter Rex's operating cycle formula by subtracting another recognized cycle—a credit cycle. Rutter Rex's expert, Mr. Furst, did not subtract a credit cycle from his calculation. A credit cycle is the amount of time between a corporation's receipt of raw materials, supplies, labor, and other inputs, and the corporation's payment for these things.[21] The credit cycle modification to the *Bardahl* formula originated in a case related to the *Bardahl Manufacturing* case, *Bardahl International Corp. v. Commissioner*, 25 T.C.M. (CCH) 935 (1966). The Tax Court in *Bardahl International* developed the credit cycle modification to account for a significant extension of credit the taxpayer corporation enjoyed from its major supplier.[22] There was also evidence in *Bardahl International* that the taxpayer corporation and its major supplier were commonly controlled by a single entity and that the credit terms between the parties were in effect controlled by this entity.

If a credit cycle modification is properly to be used in calculating a corporation's operating cycle, the length of the credit cycle is subtracted from the sum of the inventory and accounts receivable cycles to determine the operating cycle.[23] The Tax Court applied a credit cycle in its *Bardahl* operating cycle computations of Rutter Rex's working capital needs for 1977 and 1978.[24] Rutter Rex claims the Tax Court erred in applying a credit cycle based on the facts of this case. Rutter Rex also claims that the law of this Circuit, as well as the other Circuits, supports a total rejection of the credit cycle modification in all cases. Rutter Rex also contends that the courts which have utilized the credit cycle have applied it erratically and inconsistently and that a taxpayer cannot possibly be expected to compute its working capital needs utilizing such a "nebulous, ill-defined and inconsistently applied concept."

Rutter Rex in the alternative asserts that the credit cycle modification to the basic operating cycle should be applied, assuming it should be applied at all, only in cases such as *Bardahl International* where there is common control of the taxpayer corporation and its supplier and the taxpay-

accumulation for working capital. *See Empire Steel Castings, supra.* Rutter Rex was in a period of business contraction in the late 1970's. This may explain why there was no attempt to use the subsequent years' figures for the working capital needs calculations.

21. Mr. Gomprecht computed the length of the credit cycle by dividing the number of days in one year by the number of times the total payables turned over. Gomprecht determined the turnover of total payables (accounts payable plus various accruals) by dividing the operating expenses for the year by the peak month accounts payable plus the average of beginning and end of year accrued liabilities plus 25% of the federal income tax accrued.

22. In *Bardahl International*, the corporation's accounts payable for the purchase of inventory it sold on behalf of another company remained unpaid for long periods of time, thus delaying the need for cash to pay for these items and thus indicating a reduction in the length of the operating cycle.

23. Mr. Gomprecht came up with a 78.83 day operating cycle for 1977 and a 85.7 day operating cycle for 1978. Mr. Furst calculated an

operating cycle of 116.4 days for 1977 and 120.36 days for 1978. The difference in these calculations is largely attributable to Mr. Gomprecht's use of a credit cycle in his computations, which reduced the length of Rutter Rex's operating cycle by 27.36 days in 1977 and by 33.95 days in 1978.

24. In its opinion, the Tax Court made several *Bardahl* computations for Rutter Rex incorporating various methodologies, including that of Rutter Rex's expert and the Commissioner's expert. All of the court's computations, however, utilized a credit cycle, which, depending upon the methodology, reduced Rutter Rex's operating cycle anywhere from 21.36 days to 24.58 days in 1977, and from 23.52 days to 31.06 days in 1978. To all of these computations, the Tax Court added the amounts it determined represented other reasonable business needs of Rutter Rex. (*See* discussion part V.B. *infra*). In each of the computations, the total amount calculated by the court as Rutter Rex's reasonable business needs for funds each year at issue was less than the prior accumulated earnings at the beginning of that year. The Tax Court therefore concluded that Rutter Rex was liable for the accumulated earnings tax on all its current income it accumulated in 1977 and 1978.

er corporation does not pay for its supplies and materials for long periods of time. Rutter Rex claims that there was evidence and testimony firmly establishing that Rutter Rex was not related to any of its major suppliers and that the company was promptly paying for its purchases, usually within seven days of its receipt of the goods.

The Commissioner concedes that there is no universal rule regarding the application of a credit cycle or even a standardized method of computing the credit cycle. The Commissioner contends, however, that when appropriate, the use of a credit cycle is an accepted part of the *Bardahl* formula. The Commissioner asserts that the Tax Court correctly found that the use of a credit cycle was appropriate in this case because there was a lag of time between Rutter Rex's receipt and use of raw materials and labor and the time Rutter Rex paid these costs. This lag was allegedly exhibited by the existence of a significant amount of accounts payable on Rutter Rex's balance sheets at the end of each month during the years at issue.

The Commissioner contends that the use of a credit cycle should not be restricted only to cases where there is common control or a relationship between the taxpayer corporation and its supplier and that no court has so held. The Commissioner asserts that when credit is extended to and utilized by the taxpayer, the use of a credit cycle is plainly necessary. The Commissioner asserts that if a taxpayer has used the credit extended to it, the taxpayer has reduced its need for working capital for the period it used the credit and this is true without regard to which party to the transaction controls the credit terms. The ultimate projection of this principle, of course, is that a credit cycle will be applied in virtually every situation since in the normal course of established business relationships there is at least some time between receipt and payment.

We have found only one circuit court opinion specifically addressing the issue of whether a credit cycle should be applied in computing the *Bardahl* operating cycle in a particular case. In *Central Motor Company v. United States*, 583 F.2d 470, 481 (10th Cir.1978), the Court held that the submission to the jury of a credit cycle modification in that case was improper because "[t]here were no details as to the actual impact of credit extended such as the payables turnover reflecting actual use of credit in paying bills to particular categories of creditors, and no evidence as to [taxpayer's] control over any credit extensions or assurance of them, or the steady availability of credit in actual practice."[25] The court, however, did not entirely rule out the use of a credit cycle. It remanded the case to allow the parties "to develop a fuller factual record pertaining to the operating and credit cycle of the company." *Id.*

The parties have cited other circuit court opinions which have affirmed decisions applying a credit cycle, but these cases did not actually address whether the application of a credit cycle was proper. *See e.g. Alma Piston Company v. Commissioner*, 35 T.C.M. (CCH) 464 (1976), *aff'd* 579 F.2d 1000 (6th Cir.1978); *W.L. Mead, Inc. v. Commissioner*, 34 T.C.M. (CCH) 924 (1975), *aff'd* 551 F.2d 121 (6th Cir.1977). In *Hardin v. United States*, 461 F.2d 865 (5th Cir.1972), we approved the district court's operating cycle formula which was *not* adjusted by a credit cycle.

We agree with the Commissioner that the credit cycle modification to the *Bardahl* formula can be considered in determining the operating cycle and working capital needs of a corporation "if evidence

**25.** Some commentators stress that a credit cycle should not be applied in the absence of a control relationship because a taxpayer's creditors may one day demand immediate payment and no longer allow the taxpayer to buy on credit. Comment, *Accumulated Earnings Tax: An Appeal for Flexibility*, 52 N.C.L. Rev. 1179, 1211 (1974); Lewis, *Accumulated Earnings Tax*, BNA Tax Management Portfolio 35–7th at A–50; Tre-

thewey, *Justifying Retention of Cash to Meet Working Capital Needs: The Problem of Section 531*, 27th Ann. N.Y.U. Tax Inst. 737, 750 (1969). Such a sudden end to credit would be quite detrimental to the taxpayer's financial position because the company would not have funds on hand to cover these immediate payments if its working capital needs are reduced by a credit cycle.

is present which justifies consideration of the credit cycle." *Central Motor Co.,* 583 F.2d at 481. We find, however, that the application of a credit cycle in this case has not been shown to be justified.

There was a dearth of evidence that Rutter Rex utilized an extension of credit from any of its major suppliers to any significant degree. Nor were there any allegations that Rutter Rex controlled any of its suppliers or was otherwise able to dictate credit terms. At trial, there was no substantial refutation by the Commissioner of Rutter Rex's claim, as testified to by Eugene Rutter and Michael O'Rourke, that it paid a significant percentage of its bills within seven days. This testimony was supported by copies of invoices representing approximately one third of all of Rutter Rex's purchases in 1977 and 1978, which showed payment within seven days.

Apparently, the Tax Court chose to disbelieve O'Rourke's and Eugene Rutter's testimony, and instead considered as determinative the sizable amounts of accounts payable Rutter Rex had outstanding at the end of each month during 1977 and 1978. The Tax Court also chose to disbelieve Rutter Rex's assertion that most of these accounts payable reflected a constant receipt of invoices for supplies and materials. The company claimed the great majority of these were paid early the following month.

The Tax Court also appears to have been unsure as to how the purchase discount system worked and the extent Rutter Rex received these discounts through prompt payment for its supplies and materials. The court apparently believed, without substantiation in the record, that Rutter Rex received only a small fraction of the discounts available to it and that this was further evidence that Rutter Rex did not pay its bills promptly. The court further appears to have grossly overestimated the amount of discounts available to Rutter Rex. Our review of the record convinces us that Rutter Rex received a large portion of the purchase discounts available to it through prompt payment. These discounts totalled $117,988 in 1977 on the purchase of $12 million in supplies and materials, and $114,352 in 1978 on the purchase of $10.5 million.

The Tax Court's findings of fact regarding Rutter Rex's payment of invoices, Rutter Rex's total purchases for 1977 and 1978, and the purchase discounts available to Rutter Rex during these years were clearly erroneous. These apparent misunderstandings by the Tax Court appear to have led that court to believe the application of a credit cycle was appropriate in this case. We conclude that the evidence presented at trial does not support the imposition of a credit cycle in this case, and therefore a remand is necessary to allow the Tax Court to recalculate Rutter Rex's operating cycle without a credit cycle modification. *See Atlas Tool Co., Inc. v. Commissioner,* 614 F.2d 860, 869 (3rd Cir.), *cert. denied sub nom., Schaffan v. Commissioner,* 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980); *State Office Supply, Inc. v. Commissioner,* 43 T.C.M. (CCH) 1481, 1489–1490 (1982). *Cf. A.T. Williams Oil Company v. Commissioner,* 42 T.C.M. (CCH) 851, 863 (1981). The Tax Court's application of a credit cycle to its *Bardahl* computations of Rutter Rex's working capital needs resulted in a substantial reduction of the length of Rutter Rex's operating cycles in 1977 and 1978 and also a significant reduction in the dollar amounts calculated by the court as being Rutter Rex's working capital needs for one operating cycle for 1977 and 1978. Such reductions are not warranted in this record.[26]

Rutter Rex also asserts that the Tax Court clearly erred in the manner in which it computed the *Bardahl* formula components. The court set out in the appendix to its opinion three different *Bardahl* computations based on three different methodologies.[27] The court appeared to find the

---

**26.** Rutter Rex asserts various computational errors made in the court's calculation of the company's credit cycle. Since we are holding that the application of a credit cycle was not appro-

priate in this case, there is no need to address these matters.

**27.** Briefly, Rutter Rex's expert, Mr. Furst, computed the company's inventory cycles and ac-

Commissioner's expert's methodology the most accurate. The Court apparently made the other two computations merely to show that the result would be close to the same regardless of the methodology.

Rutter Rex's expert's method of computation was different from the method ordinarily used to compute these cycles. In general he based his calculations on the three highest consecutive months. *But see State Office Supply, Inc.*, 43 T.C.M. at 1489. At trial, Furst claimed that his method was justified in this case because of Rutter Rex's unique and unpredictable business cycle. The Tax Court rejected Furst's conclusions and instead accepted the computations of the Commissioner's expert who utilized a modification of the peak month method of computation. *See e.g. Snow Manufacturing Company v. Commissioner*, 86 T.C. 260 (1986); *Grob, Inc. v. United States*, 565 F.Supp. 391, 396–97 (E.D.Wisc.1983); *Alma Piston Co. v. Commissioner*, 35 T.C.M. at 475–76; *Doug-Long, Inc. v. Commissioner*, 72 T.C. 158, 176–78 (1979); *Kingsbury Investments, Inc. v. Commissioner*, 28 T.C.M. (CCH) 1082, 1085–89 (1969); *Bardahl International*, 25 T.C.M. at 945–46.

We see no error in the Tax Court's accepting Mr. Gomprecht's use of the peak month method of computing Rutter Rex's *Bardahl* operating cycle. Obviously on remand, since we are holding that the application of a credit cycle was not appropriate in this case, the Tax Court will have to recompute Rutter Rex's inventory and accounts receivable cycles using the peak month method without applying as a factor accounts payable. The court needs to determine which month in 1977 and which month in 1978 had the highest combined level of inventory and accounts receivable and use the figures from that month to determine inventory and accounts receivable turnover for each year.

### B. Determination of Rutter Rex's Other Business Needs

▮ Rutter Rex asserts other justifications for accumulating its earnings beyond its needs for working capital for its day-to-day operating expenses. As explained in the Treasury Regulations, the "reasonable needs of the business" include "the reasonably anticipated future needs of the business." Treas.Reg. § 1.537–1(a). These needs would include future expansion, modernization, or diversification, replacement of equipment or plants, and provisions for adverse business risks and contingencies. The regulations, however, require that "[i]n order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation." Treas.Reg. § 1.537–1(b).[28]

---

counts receivable cycles by using the average of the three highest consecutive months for each year for inventory to compute inventory turnover and the three highest consecutive months for each year for accounts receivable to compute accounts receivable turnover. The three highest consecutive months for inventory each year did not correspond to the three highest consecutive months for accounts receivable in Furst's computations.

The Commissioner's expert, Mr. Gomprecht, used a method which he termed the "net-peak" month method. He used the inventory, accounts receivable, and accounts payable figures from the one month in each year which he determined to be the peak month for Rutter Rex's demand for working capital to compute the turnover for each of these operating cycle components. Gomprecht used as the peak month for each year the month in which the total of inventory plus accounts receivable minus accounts payable was the greatest. As a result, the figures for inventory, accounts receivable, and accounts payable were all from the same month for each year. Gomprecht's computations were a modification of the traditional peak demand computation which uses the month in which the sum of inventory and accounts receivable is at its highest level for the year without taking into account accounts payable.

Finally, the Tax Court made its own independent calculations of the cycle components by using a "true average" method for determining inventory, accounts receivable, and accounts payable turnover. This method has been used in some cases, *see e.g. W.L. Mead Inc., supra*, but the Tax Court took the position that the peak demand method is preferable.

**28.** Treas.Reg. § 1.537–1(b)(1) reads in full:

(b) Reasonably anticipated needs. (1) In order for a corporation to justify an accumulation

See also Motor Fuel Carriers, 559 F.2d at 1351; Atlas Tool Co., 614 F.2d at 868; Myron's Enterprises, 548 F.2d at 333. Whether a corporation had specific, definite, and feasible plans during the relevant tax years for use of its accumulated earnings is a question of fact reviewable by this Court under the clearly erroneous standard. Exempt Carriers, Inc. v. United States, 644 F.2d 1027, 1028 (5th Cir.1981); Motor Fuel Carriers, 559 F.2d at 1352; Thompson Engineering Co., 751 F.2d at 197.

■ With regard to plans for expansion, modernization, diversification, replacement of equipment, and similar business needs, the relevant inquiry is "whether the company's plans appear to have been a real consideration during the tax year in question rather than simply an afterthought to justify the challenged accumulations." Exempt Carriers, 644 F.2d at 1028. See also Motor Fuel Carriers, 559 F.2d at 1354; Smoot Sand & Gravel Corporation v. Commissioner, 274 F.2d 495, 499 (4th Cir.), cert. denied, 362 U.S. 976, 80 S.Ct. 1061, 4 L.Ed.2d 1011 (1960). In order for such plans to be specific and definite, however, the taxpayer corporation need not have "formal blueprints for action." Motor Fuel Carriers, 559 F.2d at 1353. See also Guarantee Abstract & Title Company, Inc. v. United States, 696 F.2d 793, 795 (10th Cir.1983); Brookfield Wire Compa-

ny, Inc. v. Commissioner, 667 F.2d 551, 555 (1st Cir.1981).

The test is whether the taxpayer intent to undertake the plan is manifested by some "substantial active move toward implementation," such as incurring expenditures to further the plan. Motor Fuel Carriers, 559 F.2d at 1352. See also Hogg's Oyster Company, Inc. v. United States, 676 F.2d 1015, 1018 (4th Cir.1982) ("[S]ome steps must have been taken toward [the plan's] realization."); Battelstein Investment Company v. United States, 302 F.Supp. 320, 327 (S.D.Tx.1969), aff'd, 442 F.2d 87 (5th Cir.1971) ("[Plans] must be manifested by a contemporaneous course of conduct."). If definite plans do exist, the taxpayer "need not necessarily consummate these plans in a relatively short period after the close of the taxable year." Motor Fuel Carriers, 559 F.2d at 1353. The accumulation, however, must be used within a reasonable time after the close of the tax year. Treas.Reg. § 1.537–1(b)(1).

The reasonableness of the accumulation is to be determined based on the facts and conditions existing at the end of the tax year at issue. This is when the decision regarding the accumulation was presumably made. Evidence of subsequent events, however, such as the completion of the project, is relevant if it throws light on the facts as they existed in the challenged years. Exempt Carriers, 644 F.2d at 1029; Motor Fuel Carriers, 559 F.2d at 1353. See also Treas.Reg. § 1.537–1(b)(2).[29]

---

of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business.

**29.** Treas.Reg. § 1.537–1(b)(2) reads:

(2) Consideration shall be given to reasonably anticipated needs as they exist on the basis of the facts at the close of the taxable year. Thus, subsequent events shall not be used for the purpose of showing that the retention of earnings or profits was unreasonable at the close of the taxable year if all the elements of reasonable anticipation are present at the close of such taxable year. However, subsequent events may be considered to determine whether the taxpayer actually intended to consummate or has actually consummated the plans for which the earnings and profits were accumulated. In this connection, projected expansion or investment plans shall be reviewed in the light of the facts during each year and as they exist as of the close of the taxable year. If a corporation has justified an accumulation for future needs by plans never consummated, the amount of such an accumulation shall be taken into account in

■ Earnings may also be accumulated to provide for potential adverse business risks and contingencies. An accumulation, however, cannot be justified merely for the purpose of protecting the taxpayer corporation from some theoretical contingency that might never transpire. *Hardin v. United States*, 461 F.2d 865, 871 (5th Cir.1972). *See also Firstco, Inc. v. United States*, 430 F.Supp. 1193, 1202 (S.D.Miss.1977), *aff'd* 607 F.2d 704 (5th Cir.1979); *Cheyenne Newspapers*, 494 F.2d at 433. *Accord* Treas.Reg. § 1.537–2(c)(5) (Retention of earnings and profits to provide against unrealistic hazards is an unreasonable accumulation.) Bare possibilities do not amount to reasonable business needs. *Hardin*, 461 F.2d at 871. "[A] contingency is a reasonable need for which a business may provide if the likelihood of its occurrence reasonably appears to a prudent businessman." *Dahlem Foundation, Inc. v. United States*, 405 F.2d 993, 1003 (6th Cir. 1968). *See also Smoot Sand & Gravel Corporation v. Commissioner*, 241 F.2d 197, 206 (4th Cir.), *cert. denied*, 354 U.S. 922, 77 S.Ct. 1383, 1 L.Ed.2d 1437 (1957).

In addition to the taxpayer corporation presenting objective evidence supporting the reasonableness of the need to provide for the adverse risk or contingency, the corporation must present evidence showing that during the tax year at issue the corporation was actually concerned over the risk or contingency and had formulated plans to provide for the risk or contingency. To do nothing but recognize potential future problems and needs and discuss possible and alternative solutions is not sufficient. *Dixie, Inc. v. Commissioner*, 277 F.2d 526, 528 (2nd Cir.1960), *cert. denied*, 364 U.S. 827, 81 S.Ct. 62, 5 L.Ed.2d 54 (1960). Definiteness of plan coupled with action taken toward the implementation of the plan are essential. *Id.*

■ Whether an accumulation of earnings is reasonable for future adverse business risks or contingencies is also to be determined by the facts and conditions as they existed in the year involved and not by subsequent events except as such events throw light upon the facts as they existed during the tax year. Not actually using funds as planned because a contingency did not occur does not of itself justify imposition of the tax. A mistaken belief as to the necessity for accumulation of funds, if made in good faith, will not render that accumulation unreasonable. *Duke Laboratories, Inc. v. United States*, 222 F.Supp. 400, 414 (D.Conn.1963), *aff'd*, 337 F.2d 280 (2nd Cir.1964); Treas.Reg. § 1.537–1(b)(2). Nor does the actual occurrence of the contingency in subsequent years necessarily justify the accumulation in prior years unless the taxpayer corporation can show that it had planned for this contingency and is not using its occurrence as an after-the-fact justification for the accumulation.

Rutter Rex claims the Tax Court's findings of fact regarding its reasonably anticipated business needs beyond those for working capital for normal operating expenses were clearly erroneous. Rutter Rex asserts various alleged errors made by the Tax Court in analyzing these needs. For one, it is asserted that the Tax Court's findings were clearly erroneous because they discussed and analyzed only four of Rutter Rex's alleged fifteen reasonably anticipated business needs. Only one of the needs the court allegedly neglected to discuss and analyze had been contained in Rutter Rex's § 534 statement;[30] the other needs had been advanced to some extent at trial through testimony and documentary evidence and had evidently been discussed in the briefs to the Tax Court. We analyze each one of these asserted needs in turn.

To begin with, two of Rutter Rex's alleged additional business needs were not shown to be needs at all. First, Rutter Rex did not make any loans to or expenditures for the benefit of its shareholders, and, second, Rutter Rex did not have any significant investments in unrelated businesses. The absence of these factors has more to do with the tax avoidance/intent

---

determining the reasonableness of subsequent accumulations.

**30.** The need to accumulate earnings to provide funds for the development, production, and distribution of Rutter Rex's product.

issue than the accumulation issue.[31] Another two of the asserted additional needs were adequately addressed by the Tax Court when it considered Rutter Rex's need for replacement and improvements to fixed assets.[32] Several other of the asserted needs were merely aspects of Rutter Rex's requirements for working capital for day-to-day operations and were adequately considered in the Tax Court's analysis of Rutter Rex's operating cycle needs.[33]

 The other alleged additional needs for funds can be categorized as dealing with potential future adverse business contingencies.[34] We agree with Rutter Rex that the Tax Court appears to have failed adequately to consider and analyze the needs for accumulating earnings for these adverse business contingencies. Rutter Rex presented substantial evidence that the nature of its business coupled with its legally acceptable aversion to borrowing demanded that it accumulate substantial capital in order to tide the company over during lean years and to allow the company quickly to act to modify its production facilities and to retrain its employees.

Rutter Rex presented evidence showing the significant costs entailed in training new employees and in retraining current employees for new tasks. It presented evidence indicating that during 1977 and 1978 its management was aware of the considerable reduction in business that the company was facing as a result of the loss of government contract work, the reduction of work for J.C. Penney, and the increased competition from foreign and offshore clothing manufacturing companies. The Tax Court was remiss in not fully evaluating and applying the evidence of these needs. On remand the Tax Court must deal with these claims.

We do not agree, however, with Rutter Rex's contention that on remand evidence of the business downturns and increased foreign competition Rutter Rex in fact encountered in the years following 1978 should be considered by the Tax Court as relevant in determining whether Rutter Rex did have reasonable concerns and sufficiently specific, definite, and feasible plans regarding these contingencies in 1977 and 1978. These are not the type of subsequent events that tend to throw light on the facts as they existed in 1977 and 1978. As established in the regulations and case law previously discussed, the fact that Rutter Rex's sales declined for the ten years following 1978 and that its accumulated earnings stockpile was significantly depleted during these years is not acceptable proof that Rutter Rex actually foresaw or planned for such events in 1977 and 1978 or whether it was reasonable for Rutter Rex to do so.

As conceded by Rutter Rex, the Tax Court did discuss and analyze four of the five business needs Rutter Rex enumerated in its § 534 statement. In addition to Rutter Rex's working capital needs for normal operations, which we discussed previously, these were the need for funds for replacement of and improvements to fixed assets, the need for funds to guard against labor disputes and disruptions, and the need for funds for training and improvements in the event of additional government business. The Tax Court rejected as being unsupported by definite plans and amounts Rutter Rex's contention that it should be allowed to accumulate all of its earnings for these needs. The court concluded that Rutter Rex's other reasonable needs besides its normal working capital needs amounted to only $200,665 in 1977 and $875,937 in 1978 for normal machinery pur-

---

31. *See* note 16 *supra*.

32. The need for funds for expansion and modernization of Rutter Rex's manufacturing plants and the need for funds for conversion of its plants.

33. The need for funds to cover increases in labor costs due to minimum wage increases, funds to cover the costs of carrying J.C. Pen-

ney's inventory, and funds to cover the costs of operating its facilities at maximum capacity.

34. These alleged needs consisted of funds to cover a reduction in business from J.C. Penney, funds for continued operation of Rutter Rex in spite of business downturns and foreign competition, and funds to tide Rutter Rex over until it could replace the coming loss of its United States government contracts business.

chases. These were the amounts actually expended for physical properties in 1978 and 1979, respectively, by Rutter Rex.[35] We see no error in the findings by the Tax Court as to these business needs.

### C. Calculation of Rutter Rex's Accumulated Taxable Income Under § 535

In determining the amount of current income, if any, subject to the accumulated earnings tax, certain adjustments are made to the corporation's taxable income for the year. 26 I.R.C. § 535(c)(1) allows an "accumulated earnings credit" for the amounts required for the reasonable needs of the business which are not covered by prior accumulations. The previous two sections of this opinion dealt with determining these amounts. 26 I.R.C. § 535(b) allows a deduction for certain taxes:

> (1) Taxes.—There shall be allowed as a deduction Federal income and excess profits taxes and income, war profits, and excess profits taxes of foreign countries and possessions of the United States (to the extent not allowable as a deduction under section 275(a)(4)), accrued during the taxable year or deemed to be paid by a domestic corporation under section 902(a) or 960(a)(1) for the taxable year, but not including the accumulated earnings tax imposed by section 531, the personal holding company tax imposed by section 541, or the taxes imposed by corresponding sections of a prior income tax law.

Treas.Reg. § 1.535-2(a)(1) provides in part:

> The deduction is for taxes accrued during the taxable year, regardless of whether the corporation uses an accrual method of accounting, the cash receipts and disbursement method, or any other allowable method of accounting. In computing the amount of taxes accrued, an *unpaid* tax which is being contested is not considered accrued until the contest is resolved.

(emphasis added). The corporation's income subject to the accumulated earnings tax is termed "accumulated taxable income."

In determining Rutter Rex's accumulated taxable income for 1977 and 1978, the Tax Court deducted from Rutter Rex's taxable income for 1977 and 1978 the taxes Rutter Rex paid with its 1977 and 1978 tax returns and the additional amounts the company paid on February 15, 1980, after the adjustments made by Agent Benigno. The court, however, did not deduct the deficiency amounts' arising from its disallowance of Rutter Rex's § 162(a)(1) deductions for the excessive compensation amounts paid to James and Eugene Rutter in 1977 and 1978. The deficiency amounts arising from these disallowed § 162(a)(1) deductions, which we have affirmed, amounted to $183,960 in 1977 and $134,280 in 1978. The Tax Court did not deduct these deficiencies because it considered these amounts "contested" and therefore not "accrued" during 1977 and 1978 for purposes of § 535(b)(1). *See Estate of Goodall v. Commissioner*, 391 F.2d 775, 800 (8th Cir.), *cert. denied*, 393 U.S. 829, 89 S.Ct. 96, 21 L.Ed.2d 100 (1968); *Doug-Long, Inc. v. Commissioner*, 73 T.C. 71 (1979); Rev. Rul. 72-306, 1972-1 C.B. 166.

Rutter Rex claims that the Tax Court erred in not deducting these deficiency amounts from its 1977 and 1978 taxable income to determine its accumulated taxable income for the two years. Rutter Rex apparently offered to pay these amounts prior to the time the Tax Court entered its final decision computing Rutter Rex's accumulated earnings tax liability. Because of this proffered payment for these deficiencies, Rutter Rex argued before the Tax Court that it should be able to deduct these amounts from its 1977 and 1978 taxable income even though it was going to appeal those deficiencies to the Fifth Circuit.

Under the accrual method of accounting, tax liabilities normally accrue and are deductible for the year in which all the events have occurred which fix the taxpayer's liability for the tax and the amount of the tax.

---

**35.** These sums presumably include those funds expended for the development, production, and distribution of Rutter Rex's product.

*See United States v. Anderson,* 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347 (1926). This is generally the year for which the tax is assessed and attributable even though the taxes may be paid in prior or subsequent years. The Supreme Court, in applying the "all events" test, however, has held that a tax liability which is contested is not accrued. *Dixie Pine Products Co. v. Commissioner,* 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 270 (1944). Generally, a contested tax, however, can accrue and be deducted in the year the contest is resolved *Id.,* or, under some circumstances, in the year the tax is actually paid. 26 I.R.C. § 461(f).[36]

Here there is no doubt that the taxes at issue are "contested" taxes. *See Doug-Long,* 73 T.C. at 79; Treas.Reg. § 1.461–2(b)(2). They were still being contested in this Court. But payment was proffered by Rutter Rex prior to the final Tax Court decision assessing the company's accumulated earnings tax liability. These taxes therefore accrued at some time for purposes of § 535(b)(1).

The question now becomes: For which year did these taxes accrue and for which year are they deductible? The briefing by both parties on this issue is scanty. We perceive three possible answers: (1) the taxes accrued and are deductible in 1977 and 1978, the years for which they were assessed and are attributable, under general relation back principles, *Dravo Corporation v. United States,* 348 F.2d 542, 172 Ct.Cl. 200 (1965); Rev. Rul. 68–632, 1968–2 C.B. 253; (2) they accrued and are deductible in 1987, the year they were proffered or actually paid, under § 461(f); or (3) they will accrue and be deductible in the year Rutter Rex exhausts its appeal of this case, under the rationale of *United States v. Consolidated Edison Company of New*

*York,* 366 U.S. 380, 81 S.Ct. 1326, 6 L.Ed.2d 356 (1961).

Relying on § 461(f), the Tax Court held that if Rutter Rex paid the deficiencies prior to its final decision assessing the company's accumulated earnings tax liability, these taxes would be considered accrued as of 1987 and deductible in 1987, and not accrued "during the taxable year[s]" 1977 and 1978 and not deductible in those years under § 535(b)(1). The Tax Court read the language "taxes ... accrued during the taxable year" in § 535(b)(1) very narrowly to reach this holding. We find that this narrow reading and holding is not a correct application of the law.

■ We emphasize that the accumulated earnings tax is a penalty tax and thus is to be strictly construed. *Ivan Allen Co.,* 422 U.S. at 626, 95 S.Ct. at 2506. Due to the special nature of the accumulated earnings tax and its focused examination of earnings accumulated in a given year, it would be inequitable and inconsistent not to allow a corporation to deduct taxes assessed and attributable for the year at issue, even though the corporation may be contesting the taxes, as long as the corporation has paid the taxes prior to the final computation of its accumulated earnings tax liability. There is no authority that Congress intended such a result since this is a penalty tax upon accumulated earnings which may or may not exist at all depending on the deficiency claimed.

We note that the Tax Court allowed Rutter Rex to deduct from its 1977 and 1978 taxable income the taxes the company had paid in 1980 resulting from the adjustments made by Agent Benigno, presumably after the court found that these taxes had accrued in and were deductible for

**36.** 26 I.R.C. § 461(f) reads:

(f) Contested liabilities.—If—
(1) the taxpayer contests an asserted liability,
(2) the taxpayer transfers money or other property to provide for the satisfaction of the asserted liability,
(3) the contest with respect to the asserted liability exists after the time of the transfer, and

(4) but for the fact that the asserted liability is contested, a deduction would be allowed for the taxable year of the transfer (or for an earlier taxable year) determined after application of subsection (h),
then the deduction shall be allowed for the taxable year of the transfer. This subsection shall not apply in respect of the deduction for income, war profits, and excess profits taxes imposed by the authority of any foreign country or possession of the United States.

1977 and 1978 even though they were not paid until 1980. *See Dravo Corporation v. United States, supra;* Rev.Rul. 68–632, 1968–2 C.B. 253. We realize that these taxes where not "contested" by Rutter Rex. We do not conclude, however, that the fact that Rutter Rex is contesting the other adjustments made to its 1977 and 1978 returns resulting from the disallowance of the § 162(a)(1) deductions should lead to a different result for purposes of determining Rutter Rex's accumulated earnings tax liability as long as the additional taxes have been paid prior to the final determination of the company's accumulated earnings tax liability. We note that Treas.Reg. § 1.535–2(a)(1) does not provide otherwise. That regulation expressly refers to *unpaid* contested taxes and makes no reference to *paid* contested taxes.

We do not consider the mechanism of § 461(f) applicable in the accumulated earnings tax context to prevent the accrual of paid contested taxes during the taxable years for which they are assessed and attributable. Nor do we believe that the general rule of *Dixie Pine Products* that contested taxes are not accrued should be indiscriminately applied in a case determining a company's accumulated earnings tax liability. Not deducting from the compa-ny's taxable income for the challenged year a contested tax liability assessed and attributable to that year, which has been paid by the taxpayer prior to the final determination of the taxpayer's accumulated earnings tax liability for the year, would lead to an overt upward distortion in the company's accumulated taxable income that has no basis in economic reality. The focus of the accumulated earnings tax is on the improper accumulation of earnings for the year at issue. Any taxes assessed and attributable for that year which have been paid should be deducted from the taxable income for the year in determining the accumulated taxable income. Otherwise the corporation will be paying an accumulated earnings tax on money it has already paid to the IRS to cover its additional income tax liability.[37]

Distinctions from the general accrual rules for contested tax liabilities have been made for the purpose of better determining the actual economic reality of the corporation for the year at issue. *See Drybrough v. Commissioner,* 238 F.2d 735, 739 (6th Cir.1956); *Commissioner v. Pacific Affiliate, Inc.,* 224 F.2d 578, 579–80 (9th Cir. 1955), *cert. denied,* 350 U.S. 967, 76 S.Ct. 437, 100 L.Ed. 840 (1956); *Russell Manu-*

---

**37.** We acknowledge that a number of cases interpreting the same language of "taxes ... accrued during the taxable year" in the code provisions imposing the personal holding company tax, 26 U.S.C. §§ 541–547, reach a different result. *LX Cattle Company v. United States,* 629 F.2d 1096 (5th Cir.1980); *Kluger Associates, Inc. v. Commissioner,* 617 F.2d 323 (2nd Cir.1980); *Hart Metal Products Corporation v. Commissioner,* 437 F.2d 946 (7th Cir.1971); *Mariani Frozen Foods, Inc. v. Commissioner,* 81 T.C. 448 (1983), *aff'd sub nom., Melinda L. Gee Trust v. Commissioner,* 761 F.2d 1410 (9th Cir.1985). The personal holding company tax is a penalty tax imposed on undistributed income retained by a personal holding company. The tax is similar to the accumulated earnings tax in that its purpose is to prevent the abusive use of the corporate form to avoid shareholder taxes and to encourage the company to pay out dividends to its shareholders instead of retaining earnings unreasonably.

These cases uniformly have held that contested tax liabilities accrued and were deductible, at the earliest, in the year of payment for purposes of computing "undistributed personal holding company income" under § 545. The cases recognized that the legislative history of § 545(b)(1) specifically provides that Congress intended, by using the word "accrued," to "incorporate settled principles of tax accounting into the deduction calculus." *LX Cattle Co.,* 629 F.2d at 1098. There is no such legislative history interpreting the term "accrued" for § 535(b)(1) purposes.

These cases recognized the potential inequity of their holding to taxpayers. But the critical point is that "Congress has provided certain relief measures that greatly mollify any hardship that a proper application of accrual principles may produce in this context. *See* 26 U.S.C. § 547." *LX Cattle Co.,* 629 F.2d at 1098 n. 3. *See also Kluger Associates Inc.,* 617 F.2d at 333; *Hart Metal Products Corp.,* 437 F.2d at 953 n. 18. Thus, § 547 allows the taxpayer to avoid this potential inequity by electing, subsequent to the final determination of its personal holding company tax liability, to make a "deficiency dividend" distribution in the amount of the assessed personal holding company taxes and thereby avoid the personal holding company tax deficiency altogether. There is no similar mechanism for avoiding the imposition of the accumulated earnings tax.

*facturing Company v. United States*, 175 F.Supp. 159, 164–65, 146 Ct.Cl. 833 (1959); *Stern Brothers & Company v. Commissioner*, 16 T.C. 295, 322–23 (1951). A similar distinction must be made for purposes of determining a corporation's accumulated earnings tax liability unless that liability is to become unfair and oppressive without any way to escape its improper application short of telling a taxpayer it cannot contest a deficiency assessment.

■ Our holding obviously is not an abandonment of the contested tax liability accrual doctrine established by *Dixie Pine Products*. Our holding is narrow. We are simply holding that for purposes of computing a corporation's accumulated taxable income under § 535 for a given year for purposes of determining its accumulated earnings penalty tax liability, the corporation must be allowed to deduct the amounts of contested taxes assessed and attributable to that year which the corporation has paid prior to the final assessment of its accumulated earnings penalty tax liability.

On remand, the Tax Court should deduct from Rutter Rex's 1977 and 1978 § 535 "accumulated taxable income" the amounts of $183,960 and $134,280, respectively, representing the additional income tax liability Rutter Rex has paid for those two tax years due to the disallowance of a portion of the company's § 162(a)(1) deductions for compensation paid to James and Eugene Rutter.

## VI. *Conclusion*

After a thorough review of the record, we are affirming the Tax Court's deficiency judgment in regard to the disallowance of the § 162(a)(1) compensation deductions. The deficiencies resulting from this disallowance were $229,217 for 1976, $183,960 for 1977, and $134,280 for 1978. We are also affirming the Tax Court's upholding the validity of the Form 872 consent and the court's decision not to shift the burden of proof to the Commissioner on the basis of Rutter Rex's § 534 statement.

We are remanding this case, however, to allow the Tax Court to recalculate Rutter Rex's operating cycle using the peak month method but without a credit cycle modification. The application of a credit cycle in this case is not supported by the record. We are also remanding this case to allow the Tax Court better to evaluate Rutter Rex's need for accumulations to protect it from various adverse business risks and contingencies. The court did not discuss these needs in its opinion although Rutter Rex presented substantial evidence at trial concerning the needs. Finally, on remand, in determining Rutter Rex's "accumulated taxable income" for 1977 and 1978 under § 535, the Tax Court must deduct the amounts of the additional tax liability for these years imposed by the court as a result of the disallowed § 162(a)(1) compensation deductions.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.