**THOMPSON ENGINEERING CO., INC.,
Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL
REVENUE, Respondent-Appellee.**

No. 83–1786.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 11, 1984.

Decided Jan. 4, 1985.

Charles R. Hembree, Philip E. Wilson (argued), Kincaid, Wilson, Schaeffer & Hembree, Lexington, Ky., for petitioner-appellant.

Joel Gerber, Acting Chief Counsel, Internal Revenue Service, Washington, D.C., Glenn L. Archer, Jr., Asst. Atty. Gen., Steven Frahm (argued), Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before KENNEDY and KRUPANSKY, Circuit Judges; and DeMASCIO, District Judge.*

PER CURIAM.

Taxpayer, Thompson Engineering Co., Inc. (Thompson Engineering), appealed from a judgment of the tax court concluding that taxpayer permitted its earnings and profits to accumulate beyond the reasonable needs of its business with a purpose to avoid income with respect to its shareholder and imposing liability upon the taxpayer for accumulated earnings pursuant to § 531 of the Internal Revenue Code of 1954 (IRC).

Taxpayer was incorporated in 1959 and, since that time, has been a construction subcontractor primarily engaged in general plumbing, heating, air conditioning, and related sheet metal work. In the mid-1960's, Billy R. Thompson (Thompson) became its sole shareholder. All of taxpayer's officers and directors were members of Thompson's family during the years at issue. As president, Thompson was responsible for taxpayer's operations, including its financial and dividend policies.

The vast majority of taxpayer's projects were performed for government agencies and involved the construction of schools, hospitals, office buildings, utility plants and federally funded housing, for which taxpayer served as a mechanical subcontractor. Taxpayer's contracts were awarded to general contractors pursuant to a procedure whereby the contractor submitted bids to the soliciting government agency which incorporated price quotations of subcontractors such as the taxpayer. The general contractor was not required to accept the lowest bidding subcontractor. In selecting a subcontractor, the general contractor considered the amount of the subcontractors' bid, the subcontractors' financial capability, physical capacity to perform, available personnel, existing workload, and experience in performing the type of work involved. Once a general contractor was awarded a contract, subcontracts were awarded to the selected subcontrac-

* Hon. Robert E. DeMascio, United States District Judge, Eastern District of Michigan, sitting by          designation.

tors. Taxpayer subcontracted only a small amount of the work it was awarded.

General contractors engaged in public works projects were required to post a performance and bid bond. The general contractor had the option, in turn, to require the subcontractor to provide a performance and payment bond. If the subcontractor was unable to provide a bond, the general contractor, with the government's permission, could substitute the next acceptable contractor. General contractors generally avoid subcontractors who are not bondable.

Russell E. Davis (Davis), taxpayer's insurance underwriter testified that insurance companies generally derive the bondable limits of a subcontractor at a figure computed at 4 to 5 times its net worth or 6½ to 7 times its working capital, as applied to the aggregated value of the subcontractor's outstanding contracts. For example, on an aggregated value of $1 million worth of work in progress, the working capital requirement would be $150,000 or $200,000 to 250,000 on net worth.

Davis testified that, notwithstanding the application of the foregoing criteria, the maximum bonding level of any given contractor was basically a subjective determination. He stated that other factors considered were "the individual, his pay record, his operating capital, his net worth, his reputation, [and] his past experience on jobs," and that "there is a great deal of subjective evaluation within those guidelines." Davis also explained that bonding companies require contractors and subcontractors to have exceptional financial strength before they issue bonds without conditions of personal indemnity.

From its incorporation through at least 1974, taxpayer's volume of business steadily increased, as did its reputation which was excellent. Taxpayer consistently operated at a profit. Beginning in 1972, however, and accelerating during 1973 and 1974, the construction industry in taxpayer's geographical area experienced dramatic price escalations and material shortages. Taxpayer's contracts with general contractors did not incorporate escalator clauses protecting it against such price increases. During the years at issue, taxpayer suffered losses on four or five of its contracts, and many of its competitors went bankrupt. Cash flow difficulties caused many subcontractors to reduce profit margins to remain competitive. Taxpayer sought to avoid the increased competition by bidding only on bigger projects.

The decision to bid on bigger jobs increased taxpayer's bonding needs. In 1972, taxpayer transferred its bonding business to Progressive Insurance Company (Progressive), of which Davis was the president and majority shareholder. Taxpayer sought to have Progressive write bonds at preferred rates and without personal indemnity. Initially, Davis placed taxpayer's bonds with the United States Fidelity and Guaranty Company, but was not able to do so as preferred rates or without personal indemnity clauses. During 1972, Davis began placing taxpayer's bonds with the American States Insurance Agency (States). Although it charged standard rates, it's subsidiary, American Economy Insurance Company (Economy) authorized preferred rates.

In July 1972, States authorized Progressive to write bonds for the taxpayer without home office referral. This authority applied to contracts of not more than $250,000, and only upon the condition that taxpayer's total contracts in progress at the time of application did not exceed $2,500,000. Subsequently, Progressive was authorized to write bonds for taxpayer with Economy at preferred rates and without personal indemnity. This was due to Progressive's experience with taxpayer, taxpayer's increased net worth and working capital, and taxpayer's greater work experience. In February, 1972, Progressive was authorized by Economy to write bonds for taxpayer without home office referral on contracts up to $750,000 so long as the total number of contracts in progress did not exceed $3,000,000. Thompson testified that it was his understanding that taxpayer

could be bonded based on a ratio of five or six times working capital and "about" four times net worth.

When submitting bids, taxpayer was required to disclose if it had ever been refused a performance bond. To avoid such embarrassment, Thompson, on occasion, conferred with Davis before submitting bids. If Davis questioned the bidding on a particular job, or if a project would exceed Davis' underwriting authority, Thompson would forego the project. As a result, taxpayer was never denied a bond and Davis made no requests to the home office for approval of amounts in excess of his underwriting authority.

In 1972 and 1973, taxpayer was typically awarded about 20 percent of the contracts upon which it submitted bids. Taxpayer's balance sheets reflected that its net assets for 1972 and 1973 were $759,830 and $896,457, respectively. Taxpayer had accumulated earnings and profits and retained current earnings and profits for the years 1971 through 1973 as follows:

| Fiscal Year | Accumulated Earnings and Profits | Retained Current[1] Earnings and Profits |
|---|---|---|
| 1971 | $535,601 | |
| 1972 | $727,507 | $191,979 |
| 1973 | $864,583 | $137,257 |

Taxpayer never paid a dividend from the date of its incorporation through fiscal year 1973, but it made a number of loans to its sole shareholder, Thompson, the outstanding balance of which reached $164,200 by late 1973.[2] The loans were reflected as "notes receivable-officers" on taxpayer's balance sheet and were evidenced by demand notes. All but two of the notes specified the interest rate payable at six percent. Thompson used all but $55,000 of the amounts loaned to him to purchase his house, a farm, and a residential lot. The remainder of the proceeds was used by Thompson to launch a new business venture.

Davis informed Thompson that the loans the company advanced to him would be taken into account in determining taxpayer's net worth but would reduce the amount of taxpayer's working capital for bonding purposes. Davis also advised Thompson that it would become necessary at some time in the future to subordinate to the bonding company the notes evidencing Thompson's personal liability to taxpayer so that the notes would not be subject to taxpayer's general creditors. Thompson testified that his loans were merely short-term investments, replacing taxpayer's prior unsuccessful venture into the stock market. Thompson had been assured by his bank that he could obtain a personal loan on short notice if it became necessary to immediately repay his loans to taxpayer.

In September 1974, taxpayer elected to be taxed as a small business corporation under Subchapter S, IRC § 1371 *et seq.* On November 15, 1974, taxpayer declared a dividend to Thompson of $112,986.63. On the same date, Thompson repaid his loans from taxpayer through July 6, 1972, in the total amount of $112,700.

Thompson's compensation as taxpayer's president was $69,665 in fiscal year 1972 and $73,268 in fiscal year 1973. He and his wife reported taxable income on their joint federal income tax returns for 1972 and 1973 of $53,485.50 and $50,571.34. Their marginal rates of federal taxation in those years were 53 and 50 percent, respectively.

---

1. The parties stipulated that these amounts are equal to " 'taxable income adjusted in the manner provided in section 535(b)'."

2. Taxpayer made four additional loans to Thompson totalling $69,200 between October 31, 1973, and September 24, 1974.

The Commissioner of Internal Revenue (the Commissioner) determined taxpayer had accumulated its income in excess of its reasonable needs and determined deficiencies in taxpayer's federal corporate income tax under IRC § 531 for the fiscal years ending August 31, 1972 and August 31, 1973, in respective amounts of $18,744.83 and $26,996.75. Taxpayer filed a petition in the United States Tax Court challenging the Commissioner's determination of the deficiencies alleging that the Commissioner erroneously concluded that it accumulated its earnings and profits in excess of its reasonable business needs with a purpose to avoid income taxes with respect to its shareholder. The tax court ruled substantially in favor of the Commissioner in Findings of Fact and Opinion reported at 80 T.C. 672 (1983). The tax court found that taxpayer required a bonding capacity of $3 million in 1972 and of 3.5 million in 1973. To accommodate that bonding capacity, the tax court determined that taxpayer needed net assets of $675,000 and $785,000 in 1972 and 1973, respectively. Because taxpayer had net assets of $754,611 and $878,519 in 1972 and 1973, the tax court concluded that taxpayer had accumulated earnings and profits in excess of its reasonable needs as follows:

|  | 1972 | 1973 |
|---|---|---|
| Availabilities | $754,611 | $878,519 |
| Needs | $675,000 | $785,000 |
| Excess | $ 79,611 | $ 93,519 |

On August 11, 1983, the tax court filed a decision in accord with its Findings of Fact and Opinion, and assessed deficiencies of $18,744.83 and $25,717.73 for 1972 and 1973, respectively.

The appeal concerned taxpayer's liability for the accumulated earning tax imposed by IRC § 531 *et seq.* Section 531 imposes the accumulated earnings tax on the "accumulated taxable income" of a corporation. Section 535 defines accumulated income to equal taxable income, with certain adjustments not relevant for purposes of this appeal, less dividends paid and that portion of the earnings and profits for the taxable year that are retained for the reasonable needs of the business. The tax is imposed only where the corporation is "formed or availed of for the purpose of avoiding the income tax with respect to its shareholders." IRC § 532(a).

When the taxpayer is able to prove that it accumulated all or any part of its earnings to meet its reasonable business needs, this amount is allowable as a credit against its accumulated earnings tax. IRC § 535(c). Upon receipt of the Commissioner's proposed notice of deficiency, the taxpayer is permitted to submit a statement of the reasons upon which it relies to justify the accumulations for its reasonable business needs. IRC § 534(b). When a § 534(c) statement is filed by the taxpayer in proper form to satisfy the requirements of the statute, the burden of proving that earnings and profits were accumulated beyond the reasonable needs of the business shifts to the Commissioner. IRC § 534(a).

Taxpayer submitted a timely § 534(c) statement and filed a motion with the tax court seeking to shift the burden of proof to the Commissioner to show that all or any part of taxpayer's earnings and profits were permitted to accumulate beyond the reasonable needs of taxpayer's business. After a hearing on the motion, the tax court found in favor of the Commissioner.

Taxpayer's statement set forth the amount of "uncompleted work in process", and specifically stated that "there are no set rules of thumb that determine the contractor's maximum bonding capacity, but rather the decision is made by the bonding company as a value judgment based primarily on factors" such as "the contractor's financial strength, reputation, credit rating, general experience, organizational setup and availability of required equipment." The statement failed to indicate either the amount of bonding capacity taxpayer sought to achieve or the amount of assets required to attain a desired bonding capacity. Because taxpayer's statement,

with respect to bonding capacity and other needs, lacked the requisite specificity and definiteness envisaged by the statute, the tax court did not err in concluding that the burden of proof remained on the taxpayer to establish that earnings and profits accumulated were not beyond the reasonable needs of the business.

Taxpayer's primary argument on appeal is that the tax court committed reversible error in the manner in which it applied the net assets test to its bonding requirements. The tax court determined that taxpayer required $3 million in bonding capacity in 1972 and $3.5 million in 1973. It further determined that to support such a bonding capacity, taxpayer required net assets of $675,000 and $785,000 in 1972 and 1973, respectively. The tax court, however, did not indicate the methodology by which it reached its determination.

The tax court apparently computed its result by multiplying the required bonding level by .225 which is the average of the reciprocals for factors of 4 and 5 (.25 and .20). Using this reciprocal, the necessary net assets would be $675,000 (3,000,-000 × .225) for 1973, which the tax court apparently rounded off to $785,000. When the figures derived by the tax court are divided by the net assets which the tax court determined to be necessary for each of the years in issue, the net assets ratios are approximately 4.44 ($3,000,000 ÷ $675,000) for 1972 and 4.46 ($3,500,000 ÷ $785,000) for 1973.[3]

Taxpayer argued that the tax court erred by not applying a factor of 4 to determine the amount of taxpayers necessary net assets, which would have established that taxpayer needed net assets of $750,000 ($3,000,000 ÷ 4) and $875,000 ($3,500,000 ÷ 4) to meet bonding capacities of $3 and $3.5 million in 1972 and 1973, respectively.

The following table compares the tax court's calculations of needs versus excess of net assets when applying factor of 4:

| | 1972 | | 1973 | |
| | Tax Court | Factor of 4 | Tax Court | Factor of 4 |
| --- | --- | --- | --- | --- |
| Availabilities | $754,611 | $754,611 | $878,519 | $878,519 |
| Needs | $675,000 | $750,000 | $785,000 | $875,000 |
| Excess | $ 79,611 | $ 4,611 | $ 93,519 | $ 3,519 |

The table reflects that the application of a factor of 4 results in a minimal excess in net assets over needs for bonding capacity. The crux of the issue, therefore, is whether the tax court erred in determining an amount of necessary assets that would be appropriate either for the average of the reciprocals for the factors of 4 and 5 or for factors of 4.44 and 4.46 in 1972 and 1973, respectively, rather than for a factor of 4.

Recalling that Davis testified that bonding companies generally consider a subcontractor qualified for bonding in an amount between 4 and 5 times net worth, taxpayer argued that the tax court's determination should have been based on the lower factor of 4 because taxpayer was seeking bonding at preferred rates, without personal indemnity during a depressed period in the construction industry and because it was Thompson's understanding that taxpayer would be able to obtain bonds for a workload of "about" 4 times net worth. Taxpayer did not otherwise introduce evidence supporting its contention that bonding capacity was limited to 4 times its net assets. The Commissioner argued that, although net worth rules of thumb are considered in determining bonding capacity, the level of bonding permitted is a subjective determination based not only upon net worth and working capital, but also upon criteria such as the contractor's reputation, its payment record and experience. Since taxpayer had an excellent reputation, a history of steady and sustained growth and conservative operating philosophy, the Commissioner asserted, the amount of net assets it needed for bonding capacity should have been much less than that derived by applying a factor of 4 and that a more realistic factor would be closer to 5. Taxpayer counters that tax court's decision, in effect, man-

3. When carried out to four digits past the deci- mal point, the factors are 4.4444 and 4.4586.

dates that even though the net assets test is generally applied within the range of 4 to 5 times net assets, it was unreasonable for Thompson to operate taxpayer when the amount of net assets corresponding to a factor lower than 4.44 or 4.46 in 1972 and 1973, respectively.

An accumulation of earnings and profits is in excess of the reasonable needs of a business if "it exceeds the amount that a prudent businessman would consider appropriate" for present and future business needs. Treas.Reg. § 1.537–1(a) (1960). To justify an accumulation for future business needs, there must be an indication that the corporation had "specific, definite and feasible plans for the use of such accumulation." Treas.Reg. § 1.537–1(b) (1960).

The determination of reasonable needs of its business is, in the first place, a task for the officers and directors of a corporation. *Bride v. Comm'r*, 224 F.2d 39, 42 (8th Cir.1955), *cert. denied*, 350 U.S. 883, 76 S.Ct. 136, 100 L.Ed. 779. The business judgment of Thompson as to taxpayer's business requirements for its proper and safe conduct is entitled to "great weight". *Hardin's Bakeries Inc. v. Martin*, 293 F.Supp. 1129, 1131 (S.D.Miss.1967). IRC § 531 does not empower the tax court to substitute its judgment for the corporation's officers concerning whether corporate dividends should be declared. *See Bride v. Comm'r*, 224 F.2d at 42 (construing former IRC § 102(a), the predecessor to IRC § 531 which contained similar language). It appears, however, that the tax court did, in fact, substitute its judgment for that of Thompson by concluding that taxpayer required net assets corresponding to a factor which was approximately the average of factors of 4 to 5 rather than at the lower end of that range.

The tax court's finding that taxpayer accumulated earnings and profits beyond the reasonable needs of the business is a question of fact, which may be set aside by this court only if it is clearly erroneous. *Helvering v. National Grocery Co.*, 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346, *reh'g. denied*, 305 U.S. 669, 59

S.Ct. 56, 83 L.Ed. 434 (1938); *GPD, Inc. v. Comm'r*, 508 F.2d 1076, 1089 (6th Cir. 1974); *Kirlin Corp. v. Comm'r*, 361 F.2d 818, 819 (6th Cir.1966); *see* Fed.R.Civ.Pro. 52(a). A finding is "clearly erroneous" when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, *reh'g denied*, 333 U.S. 869, 68 S.Ct. 788, 92 L.Ed. 1147 (1948). Since taxpayer proved that it retained its net assets within the range appropriate for the bonding capacity which the tax court itself concluded was appropriate, this court is of the opinion that the tax court committed error.

The decision of the tax court holding taxpayer liable for the accumulated earnings tax under IRC § 531 is reversed.