MYCO INDUSTRIES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Myco Industries, Inc. v. Commissioner
Docket No. 6195-91
United States Tax Court
T.C. Memo 1992-147; 1992 Tax Ct. Memo LEXIS 155; 63 T.C.M. (CCH) 2355; T.C.M. (RIA) 92147; March 12, 1992, Filed *155 Karl Norman Clifford and Stephen J. Stone, for petitioner. Martin M. Van Brauman, for respondent. BEGHE
BEGHE
MEMORANDUM OPINION BEGHE, Judge: This opinion addresses respondent's motion under Rule 142(e)[1] to allocate the burden of proof on the reasonableness of petitioner's alleged business needs for accumulated earnings tax purposes. Respondent determined that petitioner was liable for the accumulated earnings tax imposed by section 531 for its fiscal years ended April 30, 1986 and 1988, in the amounts of $ 428,207 and $ 3,208,344, respectively. Petitioner contends that its reasonably anticipated business needs exceeded its accumulated earnings, and that therefore it does not owe any accumulated earnings tax. The reasonableness of petitioner's claimed business needs will be the primary issue in any trial of the merits of *156 this case. If those needs exceed accumulated taxable income (after adjustments under section 535(b)), petitioner will owe no tax; if they do not, petitioner nonetheless will be able to reduce its accumulated taxable income by the amount of reasonable accumulations. Sec. 535(a), (c). Contrary to ordinary Tax Court practice under Rule 142(a), respondent has the burden of proof on the issue of the reasonableness of the accumulations if either of two conditions is satisfied, sec. 534(a): first, if respondent fails to issue a notification to the corporation, prior to the issuance of any notice of deficiency, that respondent proposes to issue a notice of deficiency based upon the accumulated earnings tax, sec. 534(b); and second, if the corporation files with respondent a timely statement "of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies" to establish that the accumulations were for reasonable business needs, sec. 534(c). In this case, prior to the issuance of the notice of deficiency, and in accordance with section 534(b), respondent issued a notification to petitioner that respondent intended to issue a notice of deficiency that *157 would be premised, in whole or part, on the accumulated earnings tax. Petitioner submitted a timely statement under section 534(c) (the statement). Respondent issued a notice of deficiency in accumulated earnings tax, and petitioner filed a timely petition with this Court. The only disputed issue on this motion is the sufficiency of the statement submitted by petitioner. Either party may move, under Rule 142(e), for the Tax Court to fix the burden of proof on the issue of the reasonableness of petitioner's accumulations. Respondent has so moved and it is appropriate to decide the Rule 142(e) motion at this time. Chatham Corp. v. Commissioner, 48 T.C. 145, 146 (1967); compare Shaw-Walker Co. v. Commissioner, 39 T.C. 293 (1962). We frequently have quoted Professors Bittker and Eustice to the effect that the statement: must constitute more than mere notice of an intent to prove the reasonableness of the accumulation. Rather, the taxpayer must show its hand by stating clearly and specifically the grounds on which it will rely to prove reasonable business needs and by setting out the facts (not the evidence, but more than conclusions *158 of law) that, if proven, support the alleged business needs for the accumulation. [Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 8.08, at 8-28 (5th ed. 1987) (same passage from 4th ed. 1979 quoted in Hughes, Inc. v. Commissioner, 90 T.C. 1, 17 (1988), and Rutter v. Commissioner, 81 T.C. 937, 939 (1983)).]
While the corporation's statement must "show its hand" and disclose the corporation's litigation theory to respondent, the statement "must outline only the basic facts necessary to notify respondent of the bases of the ground[s] asserted." Soros Assoc. Intl., Inc. v. Commissioner, T.C. Memo. 1982-79. "[T]he taxpayer corporation is not required to state facts sufficient to meet a burden of proof which it may never have." Id. The Fifth Circuit has held that: the statement simply serves a notice function. Whether the "grounds" divulged in the statement subsequently prove convincing is irrelevant to this function. * * * But just as the statement is not supposed to be legally sufficient on the question of definiteness, neither is it supposed to be a substitute for testimony *159 at trial. * * * [Motor Fuel Carriers, Inc. v. Commissioner, 559 F.2d 1348, 1352 (5th Cir. 1977), revg. T.C. Memo. 1975-296; citations omitted.]
The Fifth Circuit later explained that the "notice function" is not satisfied "if the taxpayer merely gives notice in general terms * * *. To satisfy its 'notice function,' the sec. 534 statement must contain sufficiently detailed factual allegations supporting the grounds." J.H. Rutter Rex Manufacturing Co. v. Commissioner, 853 F.2d 1275, 1283 (5th Cir. 1988), affg. 81 T.C. 937 (1983) on this issue. The facts must be "substantial, material, definite, and clear." Id.; see also Thompson Engineering Co. v. Commissioner, 80 T.C. 672, 693 (1983), revd. on another issue 751 F.2d 191 (6th Cir. 1985); Bohac Agency, Inc. v. Commissioner, T.C. Memo. 1971-228. The purpose of the statement is to provide respondent with "a sufficiently clear idea of how the taxpayer planned to proceed at trial." J.H. Rutter Rex Manufacturing Co. v. Commissioner, supra at 1284; see also Motor Fuel Carriers, Inc. v. Commissioner, supra at 1352. *160 We consider each ground in the statement separately. As a result, we may impose the burden of proof on respondent with respect to some grounds and on petitioner with respect to other grounds. Hughes, Inc. v. Commissioner, supra at 18; Soros Assoc. Intl., Inc. v. Commissioner, supra.Petitioner will also have the burden of proof with respect to any grounds or amounts not mentioned in the statement. Sec. 1.534-2(a)(2), Income Tax Regs.
If petitioner's statement with respect to a particular ground provides support for petitioner's assertion that some accumulation was reasonable, but fails to provide sufficient facts to support the full amount of the accumulation, then we will impose the burden of proof on respondent only to the extent the supporting facts are sufficiently disclosed. Petitioner will have the burden of proof for amounts in excess of those supported in the statement. Rule 142(a); Soros Assoc. Intl., Inc. v. Commissioner, supra.
For the purposes of ruling on respondent's Rule 142(e) motion, we will state the facts in Myco's statement as if they were true. Soros Assoc. Intl., Inc. v. Commissioner, supra. *161 It should be borne in mind that we do so to avoid awkwardness in statement, and that we are not making findings of fact at this time. Chatham Corp. v. Commissioner, supra at 147. The grounds for petitioner's accumulations can be categorized by the two different methods used to explain the accumulations. For some grounds, petitioner has provided management's best estimate of reasonably anticipated expenditures. If the facts disclosed in the statement are sufficiently substantial, material, definite, and clear to permit respondent to prepare for trial, we will deem the statement sufficient as to these grounds. Respondent may carry her burden of proof at trial by showing, e.g., that no estimate in fact was made as of the close of a particular fiscal year, or that the estimate was disproportionate to what was reasonably necessary for petitioner's business, or that petitioner's asserted need was too speculative to be reasonably anticipated. Respondent has argued that these potential trial theories are reasons to find the statement insufficient. It is well established that these arguments are more suitably left for trial. Chatham Corp. v. Commissioner, supra at 147; *162 K&R Delivery, Inc. v. Commissioner, T.C. Memo. 1987-618. On certain other grounds, petitioner's statement relies on formulae to show the reasonableness of the accumulation. For instance, as will be explained in more detail below, petitioner claims that exploration costs are a function of the times and amounts of expiring acreage. On these grounds, petitioner will have made a sufficient disclosure if it states the formula (whether expressed algebraically or in plain English) relied upon for determining an anticipated need, sufficient data to use the formula, and the end result of the formula. Respondent may meet her burden of proof at trial if she shows by a preponderance of the evidence, e.g., that the formula itself is unreasonable, or that the data are inaccurate or unrealistic. Petitioner Myco Industries, Inc., has its principal place of business in Artesia, New Mexico. Myco is engaged primarily in oil and gas exploration and production. Myco also has a commercial real estate business. Myco's statement asserts that at the end of the fiscal years 1986 and 1988, it had reasonably anticipated business needs totaling $ 78,879,361 and $ 90,439,080, respectively. *163 We address individually each of the grounds asserted by petitioner as reasonable business needs. 1. Section 303 Redemption
Myco asserts that it was reasonable to accumulate $ 10,656,155 in 1986 and $ 13,976,190 in 1988 for the purpose of making a stock redemption under section 303. Respondent has made no concession on this ground. Section 303 provides capital gain treatment for corporate distributions to redeem stock included in the gross estate of a shareholder, up to the total amount of State and Federal death taxes, funeral expenses, and administration costs. Section 537(a) provides that a section 303 redemption is a reasonable business need. We deal here with petitioner's explanation of why the section 303 redemption was reasonably anticipated and the distribution amount that could have been reasonably anticipated. Martin Yates III died August 1, 1985. He owned a community one-half interest in 70 percent of the outstanding shares of Myco. These shares were included in his gross estate and qualified for section 303 treatment on redemption. Both the estate and Myco intended to use section 303 to the fullest permissible extent. The original due date for Mr. Yates' *164 Federal estate tax return was May 1, 1986, the day after the close of Myco's fiscal year 1986. The estate filed a timely Application for Extension of Time to file the return, along with an estimated Federal estate tax payment of $ 8,019,332. At the time, it was estimated that it would be liable for estate and inheritance taxes in New Mexico, Texas, and Colorado totalling $ 2,636,823. Myco advanced $ 8,750,000 to the estate on or about April 25, 1986 -- 5 days before the end of Myco's fiscal year ended April 30, 1986 -- to defray the Federal estate tax payment. In June 1986, Myco made an additional advance to the estate in an unspecified amount to pay State estate and inheritance tax liabilities. It is not clear from the statement whether these advances were redemptions or loans or something else. Respondent asserts in his motion papers that the advances were loans. Mr. Yates' Federal estate tax return was filed on or about October 31, 1986. The return showed a tax liability of $ 5,573,819. The return included a credit for State death taxes of $ 1,658,199. The Internal Revenue Service then audited the return. On April 21, 1988, Myco's board of directors decided to redeem *165 half of Mr. Yates' stock for $ 3,709,140. The price per share was the valuation listed on the estate tax return. The board resolution stated that if it should finally be determined that the shares' value was greater than the amount paid, the corporation would increase correspondingly the amount paid per share "retroactive to April 21, 1988." The revenue agent examining the return ultimately issued a report increasing the estate tax by $ 15,369,462 and valuing Mr. Yates' community interest in the shares at $ 13,976,190. This valuation was still subject to review at the time of the writing of the statement. For fiscal year 1986, Myco has disclosed sufficient facts to place the burden of proof on respondent. Although not a model of clarity, [2] the statement says that the $ 8.75 million advance was not a section 303 redemption, that the estate's State and Federal death tax liabilities totaled an estimated $ 10,656,155, and that the estate and the corporation intended to use section 303 to its fullest extent. Respondent has the burden of proof on this ground for 1986. *166 As of the end of taxable 1988, the estate was undergoing the Federal estate tax audit. Myco appears to rely on the report of the examiner in making its assertion that $ 13,976,190 was reasonably accumulated. However, the statement does not say precisely when the examiner's report was issued, and the clear implication is that the examiner's report was issued after the end of the fiscal year ended April 30, 1988. As of the end of that year, Myco's management reasonably could have expected the estate to incur $ 10,656,155 in taxes, plus any additional taxes Myco's management expected to be added because of the estate tax audit. But, inasmuch as there is nothing in the statement regarding the belief of Myco's management as of the end of taxable 1988 as to the outcome of the audit, the statement does not provide sufficient facts to place the burden of proof on respondent for the additional $ 3,320,035. We therefore hold that the burden of proof for fiscal year 1986 is on respondent. For fiscal year 1988, we hold that the burden of proof is on respondent for amounts up to $ 10,656,155, and on petitioner for amounts in excess of $ 10,656,155. 2. Acquisition of Producing Properties
*167 Myco asserts that it was reasonable to accumulate $ 5 million in both fiscal years 1986 and 1988 for the acquisition of oil- and gas-producing properties. Respondent has conceded that $ 2.4 million of the 1988 accumulation was reasonable. Up until 1986, Myco had invested primarily in properties with unproven potential for the production of oil and gas. However, when the energy market crashed in 1986, Myco found that proven reserves could be acquired economically. Myco decided prior to the end of fiscal 1986 to change its strategy and anticipated spending a "significant dollar amount" on proven reserves. Myco devoted several months to acquiring contacts and information regarding proven reserves. In November 1987, the company contracted with DYAD Petroleum Co. to locate prospective purchases in Glasscock County, Texas. In November 1988, Myco successfully bid $ 1,010,000 for properties in Glasscock County. At the same time Myco was part of a group bidding on properties in Eddy County, New Mexico. The group was successful, and Myco's share of the cost was $ 400,000. Myco also participated at an unstated time with Yates Petroleum in making a successful $ 16.3 million bid on *168 certain properties, of which Myco's share was $ 1 million. At the time the statement was prepared, Myco was considering acquiring $ 1 million in additional interests in properties owned by Yates Petroleum. Myco's plans as of April 30, 1986, as they are portrayed in the statement, were insufficiently definite to justify an accumulation of earnings. Myco does not provide any estimate by Myco's management as of the end of fiscal 1986 regarding the amount the company would invest in proven reserves, nor does it provide any facts which would justify an estimate. While the statement does portray Myco as an active participant in the proven reserves market by the end of fiscal year 1988, as with 1986, there is no statement of the amount that Myco's management believed the company would invest in the future in proven reserves (other than the unsupported assertion that $ 5 million was a reasonable amount to accumulate), and no facts that would support an estimate. We therefore hold that the burden of proof is on petitioner for amounts accumulated in fiscal year 1986 for the acquisition of proven reserves. Inasmuch as respondent has conceded that $ 2.4 million was reasonably accumulated *169 for fiscal year 1988, we hold that the burden of proof is on petitioner on the issue of the reasonableness of accumulations in excess of the amount conceded. 3. Lease Bonuses
Myco asserts that it was reasonable to accumulate $ 14 million in both fiscal years 1986 and 1988 to pay lease bonuses. Respondent has made no concession on this ground. During these years the oil and gas industry was depressed. During fiscal 1986 Myco spent $ 1,404,316 on lease bonuses, and expected a doubling or tripling of this amount in future years to take account of shorter lease terms and increasing competition for productive properties. Based on these facts alone, Myco asserts $ 14 million was reasonably accumulated. Myco's statement provides little information, and Myco fails to explain how the data support its assertion that 10 times its 1986 expenditure was reasonably accumulated. In other words, Myco has failed to disclose its theory and "show its hand". The $ 14 million number might have been picked at random, for all we can tell from the statement. We therefore hold that the burden of proof remains with petitioner on this ground for both fiscal years. 4. Lease Exploration *170 and Development
Myco asserts that it was reasonable to accumulate $ 25 million in both fiscal years 1986 and 1988 to cover the cost of exploration and development of leased properties. Respondent has made no concession on this ground. As of the end of the fiscal years in issue, Myco was considering developing the Big Eddy field. Myco anticipated drilling up to 50 wells at $ 500,000 each, or $ 25 million total. Myco delayed the project until after fiscal year 1988 because of low energy prices. Myco also anticipated "substantial" development of the Dagger Draw field. Between 1986 and 1988, Myco participated in the drilling of two wells at Dagger Draw. Since 1988, Myco has participated in the drilling of 31 wells at Dagger Draw. The average cost per well at Dagger Draw was $ 600,000, and Myco's share of expenditures was 15 percent, so Myco's share of the 33-well total was $ 2,970,000. Myco claims the anticipated amounts were $ 2,870,000 in 1986 and $ 2,790,000 in 1988. Myco also anticipated developing the reserves it was going to purchase in Glasscock County, Texas. As of the end of fiscal year 1988, Myco anticipated paying 100 percent of the cost of drilling 13 wells at *171 $ 550,000 each, or $ 7,150,000. Yates Petroleum subsequently took a 40-percent interest in the Glasscock County reserves. Prior to the end of taxable 1988, Myco was negotiating a farmout of acreage from Bassett & Birney Corp. Myco anticipated drilling eight wells. Myco subsequently acquired the farmout, and another nearby farmout with potential for eight more wells. Myco held an undeveloped tract known as East Turkey Tract. As of the end of taxable 1988, Myco foresaw drilling at least one test well on this tract, at a cost of $ 500,000. Myco has disclosed ample facts to justify an accumulation of $ 25 million in each fiscal year. Respondent will be able to adequately prepare for trial. We therefore hold that respondent has the burden of proof on this ground for both years. On the other hand, Myco says in its statement that "it is not practical to set forth a comprehensive listing of the multitude of potential areas of exploration and development under consideration as of April 30, 1986, and April 30, 1988." Be that as it may, we hold that petitioner has the burden of proof with respect to any exploration and development project not specifically referred to in its statement. *172 5. Acquisition of Commercial Real Estate
Myco asserts that it was reasonable to accumulate $ 5 million in 1986 and $ 6,260,000 in 1988 to purchase commercial real estate. Respondent has conceded that $ 265,312 in fiscal year 1986 and $ 2,265,312 in fiscal year 1988 was reasonably accumulated. Myco had decided to diversify into commercial real estate by April 1984. On March 1, 1984, Myco hired Frank W. Yates, Jr., who had extensive real estate experience. In May 1985, Myco acquired a pipeyard near Carlsbad, New Mexico, for $ 110,000. In November 1987, Myco acquired the Claydesta Downtown Building in Midland, Texas, for $ 2 million. In January 1988, Myco anticipated pending $ 1.26 million to remodel the building. Myco anticipated acquiring other commercial real estate. While it is apparent that Myco had gotten into the commercial real estate business by the time of the years in issue, Myco has failed to disclose any facts that might tend to prove reasonableness of any accumulation for fiscal year 1986. Myco's plans as portrayed as of that date were insufficiently definite to justify the claimed accumulations. Although Myco subsequently acquired the Claydesta Downtown *173 Building, there is no suggestion in the statement that the acquisition was anticipated as of the end of taxable 1986. Therefore, we hold that petitioner has the burden of proof for 1986 for amounts in excess of respondent's concession of $ 265,312. For 1988, petitioner likewise fails to allege any definite plans to acquire commercial real estate. Respondent conceded $ 2,265,312, or about $ 1 million more than the accumulation for remodeling the Claydesta Downtown Building, was reasonably accumulated. We hold that the burden of proof is on petitioner for amounts in excess of $ 2,265,312 for 1988. 6. Risks Peculiar to the Oil and Gas Industry
Myco asserts that the especially dangerous nature of the oil and gas industry exposed it to potential liability for torts and environmental law violations. Myco claims that it was reasonable to accumulate $ 10 million in each year in issue to cover these potential claims. Respondent concedes that an accumulation of $ 1.7 million in each year was reasonable. Myco cited one instance from 1988 where a field had to be shut in because a corrosive compound (arsenic) was found in the natural gas from the field. The field was shut in for *174 6 months, until a way of removing the arsenic was found. During this period, Myco lost 40 percent of its operating revenues. Myco contends that it could have been liable for customers' equipment failures caused by arsenic corrosion. Myco states that its total fixed operating costs were $ 75,000 per month. Myco also believed it was exposed to potential lawsuits from working interest owners for negligent operation of wells. Myco contends that insurance was either unavailable, prohibitively expensive, or inadequate to cover its potential exposure. In addition, Myco also might have required funds for unanticipated expenditures, such as to develop fields that are surprisingly productive. While Myco's discussion of potential exposures attempts to create the impression that danger lurks near every well, Myco has not provided any information on its loss experience or the loss experience of comparable companies. If Myco never paid a single claim of the type listed above, and if it could not determine the loss experience of other firms in its industry, then it would have had no reasonable basis for estimating its potential exposure. Even the anecdote about the arsenic episode does *175 not say how much Myco lost, except in terms of a percentage of monthly revenues, which number is not included anywhere in the statement. In light of respondent's concession that $ 1.7 million was reasonably accumulated in each year, we hold that the burden of proof is on petitioner with respect to amounts in excess of $ 1.7 million for each year. 7. Working Capital
Myco asserts that it was reasonable for it to accumulate $ 2,288,206 in 1986 and $ 3,076,363 in 1988 for working capital. Respondent has conceded in full the reasonableness of these accumulations. The burden of proof issue on this ground has therefore been mooted. 8. Palau Prospect
Petitioner alleges that it was reasonable to accumulate $ 2 million in 1986 and $ 2,707,346 in 1988 to finance development of offshore oil and gas wells under a license agreement from the Republic of Palau, a group of islands located in the Pacific Ocean. Respondent has made no concession as to the reasonableness of this accumulation. Myco was a 29.7-percent participant in a group holding a license from Palau. Myco anticipated that its share of the total cost of developing the project would be $ 4 million. The group decided *176 to attempt to sell half its interest in the project prior to the end of the fiscal year 1986, which would have reduced Myco's share of the costs to $ 2 million. By the end of taxable 1988, Myco had incurred expenses of almost $ 1 million. In April 1988, the group made a revised analysis of the costs of completing the project. Under the revised estimate, Myco's share of the costs was to be $ 2,966,495 for drilling and $ 2,567,565 for continuing lease rentals, of which Myco already had expended $ 119,368, for a total of $ 5,414,692 to be spent in the future. Because the group was still trying to sell a half interest, Myco believed that it was reasonable to accumulate only half that amount, or $ 2,707,346. Myco has provided a sufficient factual basis for respondent to prepare for trial. Therefore, respondent has the burden of proof on this ground for both fiscal years. 9. Plugging Liabilities
Myco alleges that it was reasonable to accumulate $ 2,955,000 in 1986 and $ 3,045,000 in 1988 to cover its liabilities for plugging oil and gas wells. Respondent has not made any concession on this ground. Operators of oil and gas wells are required by State and Federal law to plug *177 the wells at the end of their useful life. Each well costs approximately $ 20,000 to plug. Myco has working interests in wells for which Yates Petroleum Corp. is the operator. For each well, Yates Petroleum reserves an amount equal to the estimated percentage depletion of the well multiplied by $ 20,000. Thus, if a well was 50 percent depleted, Yates Petroleum would reserve $ 10,000 for plugging costs. Myco owned an estimated 15-percent working interest in Yates Petroleum's wells, and therefore would have to pay 15 percent of the costs. Based on this formula, Yates should have reserved $ 18.7 million for plugging liability in 1986 and 1988, and Myco should have reserved $ 2,805,000. In addition, Myco operated its own wells, for which it claims it was reasonable to accumulate $ 150,000 in 1986 and $ 240,000 in 1988 for plugging liabilities. Although Myco will eventually be reimbursed by working interest owners, Myco will have to advance the money for plugging. Although we are inclined to believe that it was prudent to accumulate earning for a plugging reserve, Myco does not disclose how many wells it or Yates was operating or how depleted the wells were. The $ 18.7 million *178 Yates reserve corresponds to 935 fully depleted wells, or 1,870 half-depleted wells. Respondent does not have sufficient data to prepare for trial. For the purpose of the statement, it might have sufficed to state the number of wells in operation and the average percentage depletion. Petitioner's statement does not even supply this information. We hold that petitioner has the burden of proof on this ground. 10. Litigation Expenses
Myco asserts that it was reasonable to accumulate $ 280,000 in 1986 to cover its share of the costs of a lawsuit against Transwestern Pipeline Co. Respondent has made no concession on this ground. As of the end of 1986, Yates Petroleum had sued Transwestern over its refusal to deal with Yates. As an owner of working interests in various Yates-operated wells, Myco was responsible for a pro rata share of litigation expenses. Myco states that the total litigation bill was estimated to be $ 2 million, and that Myco would be responsible for 14 percent, or $ 280,000. The suit was settled in 1987 and Myco's share of litigation costs was $ 242,000. Myco has stated sufficient facts to allow respondent to prepare for trial. Therefore, respondent *179 has the burden of proof on this ground. 11. Dagger Draw Gas and Saltwater Disposal Facilities
Myco contends that it was reasonable to accumulate $ 1 million in 1986 for gas sweetening and saltwater disposal facilities at the Dagger Draw field. Respondent has made no concession on this ground. Myco foresaw participating in oil wells to be operated by Yates Petroleum at Dagger Draw. These wells also produce large quantities of "sour" natural gas (gas with too much hydrogen sulfide) and saltwater. In order to market the "sour" gas, it must first be "sweetened" by removal of hydrogen sulfide. Also, environmental laws require that saltwater from the wells be disposed of in a particular manner. In 1987, the estimated cost of gas gathering and sweetening was $ 1 million, and for saltwater disposal was $ 600,000. In 1988, the total estimate escalated to $ 4.4 million. Myco was not certain as of the end of the 1986 fiscal year how much of an interest it would acquire in Dagger Draw, but thought that it might acquire as much as 30 percent. There were no estimates of the cost of the Dagger Draw improvements as of the end of taxable 1986, but Myco knew they would be "very expensive." *180 Myco has not disclosed sufficient facts to justify its accumulation. Myco had no estimates of the cost of the improvements as of the end of 1986. We do not dispute the statement that "MYCO's management was reasonable in desiring to retain a large accumulation of funds to cover this reasonably anticipated cost." Even if it was reasonable to accumulate funds, however, the statement is insufficient because it does not provide any dollar estimates, nor does it provide any facts (other than later estimates) that would justify those estimates. We hold that petitioner has the burden of proof on this ground. 12. Big Eddy Unit Saltwater Disposal Facilities
Petitioner claims that it was reasonable to accumulate $ 700,000 in 1986 to pay for saltwater disposal at the Big Eddy Unit. Respondent has conceded the reasonableness of this accumulation in full. The burden of proof issue on this ground has therefore been mooted. 13. Accumulated Earnings Tax Contingent Liability
Myco asserts that it was reasonable to accumulate $ 3,149,606 in 1988 to pay a potential accumulated earnings tax liability for 1983 and 1984. Respondent has conceded the reasonableness of this accumulation *181 in full. The burden of proof issue on this ground has therefore been mooted. 14. Transwestern Lawsuit Contingencies
Myco asserts that it was reasonable to accumulate $ 2.59 million in 1988 for contingencies arising out of the settlement of the lawsuit with Transwestern Pipeline Company. Respondent has made no concession on this ground. As a result of the lawsuit against Transwestern Pipeline, Yates Petroleum, Myco, and other working interest owners received an $ 82 million settlement. If those proceeds were adjudicated to be from the proceeds of natural gas sales, then the royalty owners in Yates-operated wells would be owed a royalty of 15.37 percent, or $ 12.6 million. Myco's share of this contingent liability was 14 percent, or $ 1,764,000. Transwestern agreed to indemnify working interest owners for 75 percent of the royalty payments, up to a cap of $ 9.45 million, but working interest owners would have to seek reimbursement from Transwestern for royalty payments. The working interest owners also believed that the settlement might be subject to a $ 5.9 million severance tax if the settlement was determined to be the proceeds of the sale of natural gas. Myco's *182 share of this liability would have been $ 826,000. In sum, Myco asserts that an accumulation of $ 2,590,000 for potential royalties and taxes was reasonable. Petitioner has disclosed sufficient facts to permit respondent to prepare for trial. We hold that respondent has the burden of proof on these grounds. 15. Yates Company (U.K.), Ltd., Prospect
Myco asserts that it was reasonable to accumulate $ 1 million in 1988 as its pro rata share of the cost of studying the potential for oil and gas exploration in southern England and the Paris basin. Respondent has conceded the reasonableness of this accumulation in full. The burden of proof issue on this ground has therefore been mooted. 16. Purchase of Parachute Mountain, Inc. Stock
Myco asserts that it was reasonable to accumulate $ 634,576 in 1988 to purchase the stock of, and make capital contributions to, Parachute Mountain, Inc., a pipeline joint venture. Respondent has conceded the reasonableness of this accumulation in full. The burden of proof issue on this ground has therefore been mooted. Summary
The parties have the burden of proof on the various grounds in the statement as follows: Fiscal Year Ended April 30, 1986
Concessions
Respondent
Petitioner
1.
Sec. 303 redemption
-0-   $ 10,656,155
-0-   2.
Acqu. of producing props.
-0-   -0-   $  5,000,000
3.
Lease bonuses
-0-   -0-   14,000,000
4.
Lease exploration
-0-   25,000,000
-0-   5.
Acqu. of comml. real estate
$   265,312
-0-   4,734,688
6.
Peculiar risks
1,700,000
-0-   8,300,000
7.
Working capital
2,288,206
n/a   n/a   8.
Palau prospect
-0-   2,000,000
-0-   9.
Plugging liabilities
-0-   -0-   2,955,000
10.
Litigation expenses
-0-   280,000
-0-   11.
Dagger Draw
-0-   -0-   1,000,000
12.
Big Eddy Unit disposal
700,000
n/a   n/a   13.
Accumulated earnings tax
n/a   n/a   n/a   14.
Transwestern suit contingencies
n/a   n/a   n/a   15.
Yates Co. (U.K.) Ltd. prospect
n/a   n/a   n/a   16.
Parachute Mtn., Inc. stock
n/a   n/a   n/a   $ 4,953,518
$ 37,936,155
$ 35,989,688
*183 Fiscal Year Ended April 30, 1988
Concessions
Respondent
Petitioner
1.
Sec. 303 redemption
-0-   $ 10,656,155
$ 3,320,035
2.
Acqu. of producing props.
$ 2,400,000
-0-   2,600,000
3.
Lease bonuses
-0-   -0-   14,000,000
4.
Lease exploration
-0-   25,000,000
-0-   5.
Acqu. of comml. real estate
$ 2,265,312
-0-   3,994,688
6.
Peculiar risks
1,700,000
-0-   8,300,000
7.
Working capital
3,076,363
n/a   n/a   8.
Palau prospect
-0-   2,707,346
-0    9.
Plugging liabilities
-0-   -0-   3,045,000
10.
Litigation expenses
n/a   n/a   n/a   11.
Dagger Draw
n/a   n/a   n/a   12.
Big Eddy Unit disposal
n/a   n/a   n/a   13.
Accumulated earnings tax
3,149,606
n/a   n/a   14.
Transwestern suit contingencies
-0-   2,590,000
-0-   15.
Yates Co. (U.K.) Ltd. Prospect
1,000,000
n/a   n/a   16.
Parachute Mtn., Inc. stock
634,576
n/a   n/a   $ 14,225,857
$ 40,953,501
$ 35,259,723
Amounts listed in petitioner's column are the difference between petitioner's claimed needs and the totals of the other two columns. The chart does not take into account the possibilities that petitioner will advance new grounds *184 for accumulation at trial or that petitioner will attempt to show that accumulations greater than those disclosed in the statement were reasonable. In either of those situations, petitioner would have the burden of proof, regardless of whether a "-0-" or "n/a" appears in petitioner's column. An appropriate order will be issued. Footnotes
1. All Rule references are to the Tax Court Rules of Practice & Procedure. All section references are to the Internal Revenue Code as in effect for the fiscal years in issue.↩
2. For example, the statement does not clearly indicate whether the estimate of Federal estate tax liability was made by the representatives of the estate or the management of the corporation. Inasmuch as there was probably a substantial overlap in the membership of these two groups, we do not believe the lack of clarity on this point should have any bearing on the allocation of the burden of proof on this issue.↩